*Se dictará sentencia de conformidad.*

MIGUEL A. PEREIRA SUÁREZ, recurrido, *v.* JUNTA DE DIRECTORES DEL CONDOMINIO PONCIANA, peticionaria; CROWN CASTLE INTERNATIONAL CORPORATION DE PUERTO RICO, interventora peticionaria.

*Número:* CC-2008-1014 *Resuelto:* 30 de junio de 2011

---

486

*Rafael E. Mullet-Sánchez* y *Jane Patricia Van Kirk,* abogados de los peticionarios; *Roland Riera Acosta* y *Luis Ángel Velázquez Mass,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR MARTÍNEZ TORRES emitió la opinión del Tribunal.

En esta ocasión debemos interpretar el alcance del Art. 34(c) de la Ley de Condominios, Ley Núm. 103-2003 (31 L.P.R.A. sec. 1293f(c)). Nos corresponde resolver si el término de prescripción de dos años estatuido allí aplica para

impugnar actos aprobados sin seguir el requisito de aprobación por unanimidad de los condóminos, como requiere la ley. Analizaremos específicamente si la impugnación del acuerdo suscrito entre el Presidente del Condominio Ponciana y Crown Castle International Corp. of PR (Crown Castle) había prescrito cuando el recurrido lo cuestionó. Evaluada la controversia, resolvemos en la afirmativa.

## I

El Condominio Ponciana es un edificio de naturaleza mixta, ya que se compone de apartamentos comerciales y residenciales. Los hechos que dan origen a esta controversia surgen luego de que el 19 de marzo de 1999, el Sr. Ángel M. Llavona Folguera, Presidente de la Junta de Directores del Condominio Ponciana, suscribió un contrato de arrendamiento con la compañía Crown Castle para la construcción, mantenimiento y operación de instalaciones de telecomunicaciones en la azotea del Condominio Ponciana por veinticinco años, prorrogable a veinticinco años adicionales. El contrato suscrito le daba el uso exclusivo e ilimitado de la azotea por un canon mensual de $700, con un aumento anual de tres por ciento. Según surge del expediente, el señor Llavona Folguera no consultó al Consejo de Titulares para otorgar ese contrato. También, para la misma fecha, arrendó a Crown Castle un apartamento de su propiedad para que colocara un equipo de comunicación desde el que operaría el equipo instalado en la azotea.

El recurrido, Sr. Miguel A. Pereira Suárez, es titular del *Penthouse* 12-A del Condominio Ponciana. Alega que expresó en varias ocasiones, formal e informalmente, su descontento con la instalación del equipo en la azotea del edificio tan pronto se enteró de ello. Sin embargo, no obra en el expediente documento alguno que acredite que el recurrido haya manifestado su inconformidad con el equipo instalado. Incluso, no se acompañó copia del libro de actas

del condominio en el que se detallan los pormenores de las supuestas reuniones celebradas entre la Junta de Directores y el Consejo de Titulares.

Surge del alegato de réplica del señor Pereira Suárez ante este Tribunal que, presuntamente, el 3 de enero de 2003 presentó una primera querella ante el Departamento de Asuntos del Consumidor (DACo) (número 600004623) sobre impugnación de los actos de la Junta de Directores del Condominio Ponciana. Sin embargo, aparentemente, el 30 de junio de 2004 DACo ordenó el cierre de archivo sin perjuicio de la querella por *falta de trámite*. Posteriormente, DACo rechazó una moción de reconsideración por presentarse fuera del término dispuesto. Incluso, en su alegato de réplica, el señor Pereira Suárez admite que *"esta información no surge de las determinaciones de hechos de DACO*, pero fue un hecho discutido por la Junta de Directores del Condominio Ponciana ante el Tribunal de Apelaciones, según lo menciona la propia parte Interventora-Peticionaria, página 13, nota 2 de la Petición de Certiorari". (Énfasis suplido.) Alegato de réplica, pág. 9. Ciertamente, en su petición de *certiorari*, la peticionaria Crown Castle discutió este hecho, pero lo rechazó en la nota al calce número dos de su alegato. Específicamente, en la mencionada nota Crown Castle aduce que

[e]n un escrito presentado por la parte querellada Junta de Directores del Condominio Ponciana, ante el TA, se indica que Pereira había presentado una querella ante DACO el 3 de enero de 2003. *Hasta ese momento Crown Castle no tenía conocimiento de la misma, ya que nunca se hizo alusión a ella en todo el curso de los procedimientos en que Crown Castle ha participado, y no forma parte del r[é]cord del caso"*. (Énfasis suplido.) Petición de *certiorari*, pág. 13 esc. 2.

No hay nada en el apéndice ni en el legajo acerca de esa querella.

Pasados seis años de la celebración del contrato, el 2 de septiembre de 2005, el recurrido presentó la querella que nos ocupa ante DACo. En síntesis, solicitó que se ordenara

a la Junta de Directores la resolución y cancelación del contrato de arrendamiento; que Crown Castle removiera a su costo las antenas instaladas en la azotea del edificio; que desalojara el cuarto de máquinas de control que le arrendó al señor Llavona Folguera; que devolviera a su estado original el área de la azotea; que se ordenara a la Junta de Directores y al Administrador aplicar, conforme al porcentaje de participación en los elementos comunes y las derramas que se establezcan, el canon mensual correspondiente a Crown Castle; y que le ordenara el pago de honorarios de abogado.

Crown Castle presentó una moción de desestimación y solicitud de intervención. En ésta solicitó la desestimación de la querella en su contra por falta de jurisdicción. Especificó que no recibió notificación de la querella hasta febrero de 2007. Sin embargo, requirió que se le permitiera participar en los procedimientos como interventor, ya que tenía un interés propietario creado como resultado de los contratos en los que Pereira Suárez solicitaba la resolución y en la propiedad que se quería remover del Condominio Ponciana. Asimismo, arguyó que la acción de impugnación presentada por el recurrido estaba prescrita toda vez que la querella se presentó seis años después de celebrado el contrato e instalado el equipo, y pasados tres años de la alegada reunión del Consejo de Titulares en la que se ordenó a la Junta de Directores cancelar el contrato en cuestión.

Luego de que el DACo celebró una vista administrativa, las partes presentaron sus correspondientes memorandos de derecho. A la vista comparecieron la parte querellante (señor Pereira Suárez), la parte querellada (Junta de Directores del Condominio Ponciana) y Crown Castle (parte interventora), todos acompañados de sus respectivos representantes legales.

El 1 de noviembre de 2007, el DACo emitió una resolución. En sus determinaciones de hecho, el DACo

tomó como ciertas las alegaciones contenidas en las actas de las distintas asambleas de titulares que se llevaron a cabo luego de la celebración del contrato. De estas actas surgía que la primera asamblea de titulares se celebró el 24 de abril de 2001; es decir, dos años y un mes después de la otorgación del contrato en controversia. Posteriormente, el 27 de noviembre de 2001, se llevó a cabo una segunda asamblea extraordinaria del Consejo de Titulares. Allí, se discutieron los pormenores del proceso de instalación de las antenas y se cuestionó la forma en que se llevó a cabo la contratación. Además, se discutió que el contrato suscrito nunca contó con la aprobación del Consejo de Titulares y que el señor Llavona Folguera actuó en atención a sus intereses personales, pues le había arrendado un apartamento de su propiedad a Crown Castle en el mismo edificio por $1,300 mensuales.

Durante esa reunión, aparentemente también se llevó a cabo una votación para auscultar si el Consejo de Titulares deseaba que se quedaran las antenas en la azotea. Se decidió, mediante votación de quince a favor y cinco en contra, que se mantuvieran las antenas en la azotea. Sin embargo, existe conflicto en cuanto a la veracidad de este acuerdo. El recurrido Pereira Suárez alega que en la reunión no se consiguieron los votos para que se mantuvieran las antenas. De las determinaciones de hecho de la resolución también se deduce que en diciembre de 2001 se celebró otra reunión en la que aparentemente la Presidenta de la Junta de Directores del Condominio Ponciana señaló que se acataría la decisión del Consejo de Titulares de solicitar a Crown Castle la remoción de las antenas. Sin embargo, Crown Castle se opuso debido a los gastos invertidos en su instalación. Por último, surge de la resolución que en el 2002 hubo otra asamblea para discutir la posibilidad de aumentar el canon que pagaba Crown Castle por mantener el equipo de telecomunicaciones en la azotea del edificio.

Según la prueba presentada, el DACo declaró nulo el contrato suscrito entre el señor Llavona Folgera y Crown Castle. Ordenó para discutir y decidir, por unanimidad, si se ratificaba o no el contrato otorgado y la posibilidad de imponer una cuota especial a los titulares de apartamentos comerciales. Señaló que de no ratificarse el contrato, Crown Castle debía remover el equipo instalado en la azotea. Entendió la agencia que como el contrato en cuestión le otorgaba a Crown Castle el uso exclusivo e ilimitado de la azotea, ello significó la alteración del uso y destino de un elemento común. Por lo tanto, se requería el consentimiento unánime del Consejo de Titulares. Por ende, concluyó que se violaron los Artículos 2 y 11 de la Ley de Propiedad Horizontal vigente en aquel entonces, Ley Núm. 104 de 25 de junio de 1958, según enmendada por la Ley Núm. 157 de 4 de junio de 1976. Por último, impuso honorarios de abogado a la parte querellada y apercibió de la imposición de multas administrativas de no cumplirse con lo ordenado.

Crown Castle presentó un recurso de revisión judicial ante el Tribunal de Apelaciones. Alegó que la agencia erró al no declarar prescrita la acción de impugnación y concluir que el contrato alteraba el uso y destino de la azotea, aunque ello no se sostenía de la prueba desfilada.

El foro apelativo intermedio confirmó la resolución y orden del DACo. El Tribunal de Apelaciones concluyó que "[l]a actuación unilateral y *ultra vires* de la Junta de Directores del Condominio Ponciana es nula en derecho al no contar con el consentimiento unánime de los titulares por lo cual no se activa ningún término prescriptivo para reclamar su corrección". Apéndice, pág. 133. En esencia, el foro apelativo intermedio consideró que el arrendamiento de un elemento común de un condominio residencial para propósitos comerciales constituye un acto que altera su uso y destino. Por ello, fundamentándose en *Rivera Rodríguez v. Junta Dir. I y II*, 173 D.P.R. 475 (2008), y en el Reglamento

del Condominio Ponciana, el Tribunal de Apelaciones concluyó que aunque la Junta de Directores tenía la facultad para colocar un equipo como el instalado en áreas comunes del condominio con el consentimiento unánime del Consejo de Titulares, eso no significaba que se podía ceder ese derecho a personas ajenas al condominio. Por consiguiente, como era necesaria la anuencia de todos los titulares para llevar a cabo el arrendamiento, el contrato en cuestión es nulo, es decir, nunca nació a la vida jurídica.

Inconforme nuevamente, Crown Castle presentó un recurso de *certiorari* ante este Tribunal. Alegó que el foro apelativo intermedio erró al no considerar los argumentos de prescripción de la acción de impugnación y al confirmar que el contrato de arrendamiento alteró el uso y destino de la azotea. Por último, añadió que el Tribunal de Apelaciones erró al aplicar la norma de *Rivera Rodríguez v. Junta Dir. I y II*, supra.

El 1 de mayo de 2009 expedimos el auto. Con el beneficio de los alegatos de ambas partes procedemos a resolver.

## II

A. Para atacar de frente las situaciones indeseables que surgían a base de la legislación anterior, el legislador dispuso en el Art. 44 de la Ley Núm. 103-2003 (31 L.P.R.A. sec. 1291 n.) que " '[e]sta Ley ... entrará en vigor noventa (90) días después de su aprobación ... *y sus disposiciones regirán a todo inmueble sometido al régimen de Propiedad Horizontal, cualquiera que sea el momento en que fuera sometido a dicho régimen'* ". (Énfasis suplido.) Precisamente por la necesidad de "alcanzar la transformación de situaciones jurídicas indeseables", se dispuso para el alcance retroactivo de esta ley. *Consejo Titulares v. Williams Hospitality*, 168 D.P.R. 101, 107 (2006). "De otra forma la sociedad estaría atada a perpetuidad a normas que impiden su desarrollo." Íd., págs. 107–108. Por ello, como seña-

lamos en *Consejo Titulares v. Williams Hospitality*, supra, pág. 110, y reafirmamos recientemente en *S.L.G. Vázquez-Ibáñez v. De Jesús, Vélez*, 180 D.P.R. 387, 399 (2010), "[*n*]*o aplicar la Ley Núm. 103*, supra, *a controversias como la de autos equivaldría a laurear actuaciones que el estado de derecho vigente conjura; estaríamos incumpliendo, entonces, con la intención legislativa. Por lo tanto, resolvemos que, en virtud de su tenor más razonable y de las poderosas razones de orden público que movieron al legislador a materializarla, la Ley Núm. 103*, supra, *aplicará retroactivamente*". (Énfasis en el original.)

Cónsono con lo anterior, a pesar de que la actual controversia surgió mientras aún se encontraba vigente la anterior Ley de Propiedad Horizontal, la letra del Art. 44 de la Ley Núm. 103-2003, *supra*, así como la interpretación que hemos hecho de la retroactividad de esta ley, nos obliga a analizar este caso según la Ley de Condominios vigente. Aclarado esto, procede evaluar las disposiciones de la Ley de Condominios de 2003 que regulan la impugnación sobre violaciones a la escritura matriz, al reglamento y a los cambios o actos que requieran unanimidad.

**B.** El Art. 34 de la Ley de Condominios, *supra*, gobierna la impugnación de los acuerdos y las determinaciones del Consejo de Titulares. Asimismo, establece el término que tiene el titular afectado para llevar a cabo dicha impugnación. El inciso (a) procura

> … reducir el número de querellas ante el foro administrativo, al requerir del querellante que ventile primero ante los organismos internos del condominio, bien ante la propia Junta o ante un Comité de Conciliación, cualquier querella en la que se cuestione una acción u omisión del Administrador o de la propia Junta. M.J. Godreau, *La Nueva Ley de Condominios*, 2da ed., San Juan, Ed. Dictum, 2003, pág. 39.

Con este procedimiento se persigue "acreditar ante la agencia que se le hizo el planteamiento ante el organismo interno y que éste, o no lo atendió oportunamente, o si lo

atendió se ratificó en la acción o en la omisión que el titular entiende le es gravemente perjudicial". Godreau, *op. cit.*

> La presentación de la reclamación internamente tendrá que hacerse dentro del término de treinta (30) días de conocida la acción u omisión que se impugna. La Junta o el Comité de Conciliación en su caso tendrán treinta (30) días para resolver el asunto. Si el titular considera adversa la decisión de la Junta o del Comité, podrá entonces recurrir al DACO. De igual forma, si la Junta o el Comité no toman acción dentro de los sesenta (60) días desde que el titular sometió su queja, puede éste recurrir a la agencia con su querella. El DACO se reserva la facultad de eximir al titular de agotar este procedimiento, si así lo ameritase la naturaleza del caso. Íd., pág. 40.

En cuanto al término de prescripción para ejercer la acción, el inciso (c) del Art. 34 señala:

> (c) La acción de impugnación de acuerdos, acciones u omisiones de la Junta de Directores, del Consejo de Titulares, con excepción de los realizados por el titular que somete el inmueble al régimen, que violen las disposiciones de esta Ley, de la escritura matriz o del Reglamento del condominio, *prescribirá a los dos (2) años de haberse notificado el acuerdo, tomado la acción o de conocerse la omisión.* Para los titulares que impugnen este tipo de acuerdo del Consejo de Titulares, el término se computará a partir de la notificación del mismo, siempre y cuando cumplan con los requisitos establecidos en el párrafo siguiente.
> Al ejercitar la acción de impugnación de acuerdos del Consejo de Titulares, el titular deberá acreditar que estuvo presente o representado en la reunión en que se tomó el acuerdo que impugna y que no votó a favor del mismo. Si estuvo ausente a pesar de que fue debidamente notificado deberá probar que su ausencia estuvo justificada. (Énfasis suplido.) 2003 Leyes de Puerto Rico 355, 403.

Por último, el inciso (e) del Art. 34 indica:

> (e) El foro de instancia en el que se diluciden las querellas o acciones presentadas por los titulares o por el Consejo de Titulares le impondrá a la parte que hubiese procedido con temeridad el pago de los gastos del pleito o de la querella, así como el pago de una suma razonable por los honorarios de abogad[o] en que realmente hubiese incurrido la parte que

obtuvo el remedio solicitado. Sólo mediante la renuncia expresa de la parte vencedora podrá dispensarse a la otra parte del pago de honorarios.

El titular que prevalezca en cualquier reclamación de su querella no tendrá que contribuir a los honorarios o gastos legales en que incurra la Junta o el Consejo de Titulares, ni a la multa que, en su caso, pudiera imponérsele a la parte querellada. Leyes de Puerto Rico, *supra*, págs. 403–404.

Las leyes antecesoras a nuestra actual Ley de Condominios no establecían un término de prescripción para impugnar las acciones que tomaba la Junta de Directores del Condominio Ponciana o el Consejo de Titulares. Así, por ejemplo, la Ley Núm. 104, *supra*, facultaba para la impugnación " 'cuando no se re[unía] el quórum necesario para tomar acuerdos'. El mismo artículo facultaba también la impugnación de las acciones de la Junta de Administración si éstas no cumplían 'con las reglas acordadas para la buena administración' ". M.J. Godreau, *El condominio: el régimen de propiedad horizontal en Puerto Rico*, San Juan, Ed. Dictum, 1992, pág. 129.

La reforma de 1976 al régimen de propiedad horizontal amplió el "artículo 42 para especificar ciertos términos y para distinguir entre condominios dedicados a comercios o establecimientos no residenciales y aquellos en que por lo menos hubiera un apartamiento dedicado a vivienda". Godreau, *El condominio: el régimen de propiedad horizontal en Puerto Rico, op. cit.*, pág. 129. A esos efectos, la ley impuso un término de treinta días para "la impugnación de acuerdos y determinaciones, que el titular estimase *gravemente perjudiciales* para él o para la comunidad de titulares ...". Íd., pág. 202. Véase Ley Núm. 157, *supra*.(¹) Ahora

---

(¹) El foro donde se presentaba la impugnación dependía de la naturaleza del condominio en cuestión, a saber, residencial o comercial. En los condominios no residenciales los acuerdos se tenían que impugnar en el Tribunal Superior. También se requería que el titular que impugnara asistiera a la reunión en la que se tomó la decisión y se opusiera. Si se ausentó debía presentar razones que justificaran su ausencia. En cambio, cuando se trataba de condominios con viviendas, las impugna-

bien, dicho término se limitaba únicamente a acciones que fueran gravemente perjudiciales para el que las impugnaba o para la comunidad de titulares. Ello fue razón para que el legislador entendiera necesario modificar este artículo en el 2003.

C. Las enmiendas introducidas al régimen de propiedad horizontal en el 2003 respondieron, en esencia, a la necesidad de realizar "ajustes para dotarlo de mayor eficacia en la consecución de sus metas originales, a saber hacer viable el derecho a la propiedad individual sobre un apartamiento dentro de un edificio o estructura arquitectónica, a fin de aprovechar al máximo el escaso terreno con que contamos". Exposición de Motivos de la Ley Núm. 103-2003, *supra,* págs. 355–356. Cimentándose en las características principales que gobiernan el régimen de propiedad horizontal, "particularmente la reiteración de que el apartamiento es el centro del régimen, la exigencia de la buena fe, así como la prohibición de actuar caprichosamente en el ejercicio de los derechos dominicales", el legislador, entre otras cosas, fijó un término prescriptivo de dos años para presentar las impugnaciones de acciones u omisiones por violaciones a la Ley o al Reglamento. Íd., págs. 356–357. Ello tuvo el fin de armonizar las distintas disposiciones de la ley con los principios que se pretenden salvaguardar en el Art. 1-A de la Ley Núm. 103-2003, *supra,* 31 L.P.R.A. sec. 1291 n.:[2] la buena fe, la prohibición de ir en contra de los actos propios y la prohibición del abuso del derecho.

---

ciones se debían ventilar en DACo y el Tribunal Superior las podía revisar.

[2] *"Propósito*

"... 'Esta Ley ... se aprueba con el propósito de viabilizar la propiedad individual sobre un apartamiento, que forma parte de un edificio o inmueble sometido al régimen de propiedad horizontal, de acuerdo a los criterios que más adelante se establecen.

" 'El titular de un apartamiento sometido al régimen de propiedad horizontal, tiene el derecho al pleno disfrute de su apartamiento y de las áreas comunes, siempre que con ello no menoscabe el derecho de los demás titulares al disfrute de sus respectivas propiedades.

Como explica el profesor Michel Godreau en su obra *La Nueva Ley de Condominios*:

Bajo la Ley de 1976 no había límite de tiempo para cuestionar la validez de este tipo de acto o gasto. Esta falla permitió en varios casos que un titular, que había presenciado y tolerado por años un cambio de fachada o el cambio de destino de determinada área en el inmueble, luego presentara querellas contra todos, alterando así la estabilidad del régimen ¿Si por largos años nadie ha tomado acción ante determinado cambio evidente, no es de presumir que todos a la larga han *aceptado* la alteración? No se trata aquí de convalidar por el transcurso del tiempo actuaciones o acuerdos que la Ley no permite, ni siquiera mediando el consentimiento unánime. Este nuevo término de prescripción para las acciones ... le impone a los titulares la responsabilidad de actuar diligentemente en la defensa de su propiedad, porque de lo contrario se interpretará que consintieron al cambio. (Énfasis en el original.) Godreau, *La Nueva Ley de Condominios, op. cit.*, págs. 29–30.

En el Informe Conjunto del Proyecto del Senado 1425 de las Comisiones de Vivienda, Banca, Asuntos del Consumidor y de lo Jurídico del Senado, de 12 de noviembre de 2002, 4ta Sesión Ordinaria, 14ta Asamblea Legislativa, se explicó que la ausencia de un término en el Art. 34 de la Ley Núm. 103-2003, *supra*, "se ha prestado a que se hayan admitido querellas luego de haber transcurrido décadas de establecido el cambio o la violación impugnada. Esto no sólo acarrea inestabilidad e inseguridad, sino que puede alterar seriamente el delicado balance de la convivencia". Las comisiones tomaron en consideración que "[n]i en la

---

" 'El Consejo de Titulares, la Junta de Directores y el Agente Administrador del condominio, tienen como deber primordial orientar sus acciones salvaguardando el principio de que el propósito del régimen de propiedad horizontal es propiciar el disfrute de la propiedad privada sobre el apartamiento y que la administración de las áreas y haberes comunes del edificio se realiza para lograr el pleno disfrute de este derecho. Correlativamente cada titular reconoce que el ejercicio del dominio en el régimen de propiedad horizontal está limitado por los derechos de los demás condóminos y que el derecho de propiedad sobre su apartamiento tiene que ejercerse dentro del marco de la sana convivencia y el respeto al derecho ajeno.

" 'En el ejercicio y el reclamo de sus derechos, los titulares actuarán conforme a los principios de la buena fe, de la prohibición de ir en contra de sus propios actos y la del abuso del derecho.' " 31 L.P.R.A. sec. 1291 n.

práctica administrativa del DACo ni en los pronunciamientos del Tribunal Supremo se ha reconocido la importancia que merece en el régimen el principio del reclamo diligente de los derechos, encarnado en la figura de la incuria y en las doctrinas del consentimiento tácito y del impedimento de ir en contra de los propios actos". Íd. El establecimiento de un término de dos años viene a reforzar la promulgación para el régimen de los principios generales del derecho enunciados en el Art. 1-A, *supra.*

En iguales términos se expresó la Comisión de Desarrollo Urbano y Vivienda de la Cámara de Representantes en su Informe de 3 de marzo de 2003 sobre el P. del S. 1425, pág. 4:

> La ausencia de un término dentro del cual deban incoarse dichas acciones ha permitido en no pocos casos que un titular por razones ajenas al principio de la sana convivencia o de la defensa *bonafide* del derecho propietario y que ha presenciado por años un cambio de fachada o el cambio de destino de determinada área en el inmueble, de repente y respondiendo, por ejemplo, a una reciente animosidad contra algún titular o contra la Junta de Directores incumbente, invoque viejas violaciones a la Ley, a la Escritura Matriz o al reglamento, y presente querellas contra todos, alterando así la estabilidad del régimen. *Si los cambios efectuados no constituyeron violaciones a normas de derecho imperativo, es decir, si la propia Ley autorizaba que mediante el consentimiento unánime se hubiesen realizado los cambios que ahora se impugnan, no hay justificación para permitir querellas tardías.* Con ello se evitaría la forma de proceder en el reciente caso de *Herbert Brown III v. Cond. Playa Grande*, 2001 JTS 83 [*Brown III v. J.D. Cond. Playa Grande*, 154 D.P.R. 225 (2001) ], en el que se permitió impugnar un cambio de destino de determinada área de un estacionamiento, a pesar de que todos, incluido el querellante, habían venido disfrutando de dicho cambio por más de una década. Se evitaría, además, el caso todavía más injusto de permitirle a los adquirientes recientes que impugnen los cambios que los titulares anteriores habían aceptado tácitamente por décadas, trastocando así el ambiente de convivencia que pueda haber existido en un condominio por largos años. (Énfasis suplido.)

Como podemos observar, las enmiendas introducidas en

el 2003 al Art. 34, *supra*, persiguen precisamente frenar el afán obstruccionista de algunos titulares que, por intereses particulares, ponen en juego la estabilidad de toda una comunidad. Como se señala en el Informe de la Comisión de Desarrollo Urbano y Vivienda de la Cámara, se estableció un término de prescripción para este tipo de reclamaciones luego de observar cómo los tribunales estaban manejando los asuntos en los que se impugnaban acuerdos del Consejo de Titulares. Un ejemplo de ello es *Brown III v. J.D. Cond. Playa Grande*, 154 D.P.R. 225 (2001), en el que declaramos nulo un acuerdo que alteró el uso y destino de las áreas del estacionamiento para visitantes a pesar de que la impugnación se realizó pasados once años de conformado el acuerdo. Partiendo de la ley vigente en aquel entonces, resolvimos que aunque estaba permitido el cambio de elementos comunes generales a elementos comunes limitados, se requería el acuerdo unánime de todos los titulares. Íd., pág. 237. Por ello, como la resolución se aprobó únicamente por una mayoría, sin importar los años que hubiesen pasado, el acuerdo era nulo. La imposición de un término de prescripción en la Ley de Condominios de 2003 finalizaría con situaciones como esas.

Por otra parte, adviértase que con la imposición de ese término de prescripción no se cierra la puerta a la posibilidad de instar acciones de impugnación. Por el contrario, siempre y cuando éstas se presenten dentro del término de dos años que dispone el Art. 42(c), *supra*, no habrá impedimento para la reclamación. Sin embargo, la situación es distinta cuando se trata de actos que estén tajantemente prohibidos por la ley. En esas instancias estamos ante una actuación nula, no meramente anulable, y por eso no hay término prescriptivo para incoar la acción. Es decir, "el cambio de destino de determinada área en un condominio, como sería destinar como área de uso general para los residentes el área originalmente designada como estacionamiento de visitantes, no es un cambio ilegal, pues la Ley

lo permite, si media el consentimiento unánime ...". Informe Conjunto al Senado sobre el P. del S. 1425 de 12 de noviembre de 2002, *supra*, pág. 33. Empero, "la destinación a un particular de un elemento común necesario, por ejemplo, no puede realizarse ni siquiera con el consentimiento unánime expreso, porque atenta contra el régimen mismo. Para la impugnación de este tipo de violación a una norma de derecho imperativo (*jus cogens*) no hay término de caducidad". Íd.

En España, la Ley de Propiedad Horizontal dispone de un término de *caducidad* para las acciones de impugnación de la Junta de Propietarios. Así, en el Art. 18 de la Ley de Propiedad Horizontal española se dispone que

> [e]l plazo para impugnar acuerdos caduca (se termina) a los tres meses de adoptarse el acuerdo por la Junta de Propietarios[,] salvo si se trata de actos contrarios a la Ley o a los estatutos (si los hay)[,] pues entonces el plazo es de un año (desde que se adoptó el acuerdo). J.Mª Zaforteza Socías, *La nueva propiedad horizontal*, Barcelona, Ed. J.M. Bosch, 2002, pág. 112.

Sobre este artículo, los tratadistas comentan que

> [t]ras la reforma de 1999 se da una nueva redacción al antiguo artículo 16 LPH, cuyo contenido se recoge, ahora, entre los actuales artículos 17 y 18 LPH. De la lectura de estos artículos, y sobre todo del 18 LPH, ya no cabe duda alguna de que los acuerdos contrarios a la LPH son meramente anulables, impugnables. D. Morales Martínez, *Propiedad horizontal. ¿nulidad o anulabilidad de los acuerdos contrarios a la LPH o los estatutos?*, 81 Rev. Crít. Der. Inmob. 2081, 2086 (2005).

Por consiguiente, según la Ley de Propiedad Horizontal española, todos los acuerdos comunitarios que la ley permite impugnar son meramente anulables y no nulos. "[L]a nulidad radical sólo operará, como dice la STS de 23 de julio de 2004, respecto de aquellos acuerdos que 'violan disposiciones legales imperativas o prohibitivas que no tengan establecido un efecto distinto en caso de contravención, y también si resultan contrarias a la moral, al orden

público o impliquen fraude de ley' ." Morales Martínez, *supra*, pág. 2086.([3]) Esta línea de interpretación

> ... está orientada a sostener un criterio flexible interpretativo, que alcanza pleno sentido y amparo interpretativo correcto en la procura de una convivencia normal y pacífica, tratándose de evitar y menos fomentar las frecuentes guerras de comunidades con la alteración inevitable de la convivencia que ha de estar presidida por la idea de justicia y la atención a las necesidades efectivas de la comunidad, debiendo predominar sobre empeños y caprichos personales o actuaciones egoístas y abusivas por falta de justificación racional, conforme a una adecuada aplicación sociológica ... o teniendo en cuenta la doctrina de los actos de anulación .... Sentencia de 23 de julio de 2004, núm. 859/2004.

Como podemos observar, la Ley de Propiedad Horizontal española persigue el mismo objetivo que la nuestra: lograr la estabilidad y la convivencia cordial y pacífica entre los titulares. Asimismo, establece la distinción para las acciones de impugnación. Aquellos actos que sean contrarios a la ley son nulos y se podrán cuestionar en cualquier momento. Por el contrario, las impugnaciones de las acciones o los acuerdos que la ley faculta que los titulares realicen, se tendrán que disputar dentro del término ordenado.

Por otra parte, en la Ley de Propiedad Horizontal española se califica el término para la impugnación como de caducidad, a diferencia de nuestra ley, que lo denominó de prescripción. Esa distinción fue producto del proceso de enmiendas que sufrió la Ley Núm. 157, *supra*. Originalmente, el legislador puertorriqueño dispuso que el término para la impugnación fuera de caducidad. P. del S. 1425 de 11 de abril de 2002, 3ra Sesión Ordinaria, 14ta Asamblea Legislativa, pág. 48.([4]) Sin embargo, luego de adoptar las

---

([3]) Véanse, a modo de ejemplo: Sentencia de 7 de octubre de 1999; Sentencias de 7 de marzo, 30 de abril, 2 y 5 de mayo, 2 de julio de 2002 y 23 de julio de 2004.

([4]) El texto original del Art. 44(c) propuesto era:

"(c) La acción de impugnación de acuerdos, acciones u omisiones de la Junta de Directores, del Consejo de Titulares, o de cualquier titular, que violen las disposicio-

recomendaciones de la Asociación de Apoyo a Condominios y del DACo se abandonó el término de caducidad y se legisló uno de prescripción. Íd. Esto constituye una gran diferencia.

"Los términos de caducidad y de prescripción tienen la misma finalidad y efecto: impedir que permanezcan indefinidamente inciertos los derechos y dar firmeza a las relaciones jurídicas." *Muñoz v. Ten General*, 167 D.P.R. 297, 302 (2006). Ahora bien, existe una crucial diferencia entre ambos. "[L]a prescripción, a diferencia de la caducidad, admite su interrupción o suspensión." Íd. Por consiguiente, "un término prescriptivo, en la medida en que se interrumpa oportunamente, puede ser indefinido, ya que su interrupción puede ocurrir en un número ilimitado de ocasiones". Íd. Por el contrario, "un término de caducidad no puede ser interrumpido o suspendido, por lo que éste siempre extingue el derecho a la causa de acción con el mero transcurso del tiempo". Íd.

Como es sabido, "[n]uestro ordenamiento jurídico permite que el término prescriptivo de las acciones quede interrumpido por una de tres (3) ocurrencias: el ejercicio de la acción ante los tribunales, la reclamacin extrajudicial del acreedor, y por cualquier acto de reconocimiento de la deuda por el deudor". *De León v. Caparra Center*, 147 D.P.R. 797, 803 (1999). Véase, además, Art. 1873 del Código Civil, 31 L.P.R.A. sec. 5303.

"Consistentemente, hemos reiterado que nuestro ordenamiento jurídico no exige forma específica para interrumpir la prescripción" mediante reclamación extrajudicial. *De León v. Caparra Center*, supra, pág. 804.

---

nes de esta Ley, de la escritura matriz o del Reglamento del condominio, *caducará* a los dos (2) años de haberse notificado el acuerdo, tomado la acción o de conocerse la omisión. Para los titulares que impugnen este tipo de acuerdo del Consejo de Titulares, el término se computará a partir de la notificación del mismo, siempre y cuando cumplan con los requisitos establecidos en el párrafo siguiente." (Énfasis suplido.)

Sin embargo, hemos señalado ciertos requisitos que debe cumplir una reclamación extrajudicial para que opere una interrupción de la prescripción. Primero, la reclamación debe ser oportuna, lo cual requiere que se realice antes de la consumación del plazo. En segundo lugar, la reclamación la debe hacer el titular del derecho o acción cuya prescripción se quiere interrumpir. Tercero, se requiere idoneidad del medio utilizado para realizar la reclamación. Por último, debe existir identidad entre el derecho reclamado y aquel afectado por la prescripción. Íd., pág. 805. "En definitiva, la reclamación extrajudicial puede plasmarse a través de distintos actos, pero todos ellos han de cumplir con los requisitos genéricos de oportunidad, identidad, legitimación e idoneidad antes reseñados." *Galib Frangie v. El Vocero de P.R.*, 138 D.P.R. 560, 568 (1995).

En cuanto a la prescripción extrajudicial, Albaladejo nos comenta que "con tal que sea ... realmente reclamación ... y no un mero recordatorio, puede revestir innumerables formas y consistir en cualquier tipo de comunicación, escrito, etc., o, en la gestión que sea, con tal de que se haga patente la petición del derecho". M. Albaladejo García, *Derecho Civil*, 17ma ed., Madrid, Edisofer S.L., 2006, T. I, pág. 905. Es decir, debe ser una "petición que muestre inequívocamente el sujeto pasivo la decisión de obtener el pago". Íd., esc. 66. Al citar jurisprudencia española, este autor señala que la norma de la reclamación extrajudicial

... se refiere a casos como presentación de la factura correspondiente (sentencia de 23 noviembre 1917), carta pidiendo el abono de los daños sufridos (sentencia de 11 febrero 1966 y 6 diciembre 1968), escrito recabando del representante legal del deudor (RENFE) la indemnización procedente (sentencia de 30 diciembre 1967), telegrama dirigido por el acreedor al deudor (sentencia de 11 febrero 1977), reclamación por carta (sentencia 21 noviembre 1997), reclamación administrativa al Ayuntamiento responsable de los daños que se pide se resarzan (sentencia de 14 julio 1998), etc. Albaladejo, *op. cit.*, pág. 905.

En iguales términos se expresa Díez-Picazo:

El Código no requiere ninguna forma especial para que se entienda realizada la reclamación extrajudicial. No exige que conste en documento fehaciente aun cuando ello pueda resultar aconsejable. Reiteradamente se han tomado en consideración la correspondencia epistolar, la consignación de una queja en los libros de reclamaciones y los telegramas y cualquier otro medio de comunicación. No existe inconveniente tampoco en que la reclamación pueda ser puramente verbal .... *Lógicamente habrá de ser objeto de prueba a quien pretenda que la reclamación se ha realizado y resulte favorecido por ella.* L. Díez-Picazo, *La prescripción extintiva en el Código Civil y en la jurisprudencia del Tribunal Supremo*, 2da ed., España, Ed. Thomson Civitas, 2007, pág. 185.

■ Esa misma postura adoptamos en *Galib Frangie v. El Vocero de P.R.*, supra, pág. 568, al disponer que "[e]n cuanto a la reclamación extrajudicial, no hay relación limitativa hecha por la ley sobre qué actos son los que se incluyen en esta causa interruptiva, y admite como tales todos aquéllos en que la voluntad del acreedor quede patente. En cuanto a la forma de la reclamación, la ley no exige ninguna forma especial". Véase, además, *Zambrana Maldonado v. E.L.A.*, 129 D.P.R. 740 (1992).

## III

Según surge del expediente, no fue hasta pasados seis años de la instalación del equipo en la azotea del edificio, que el recurrido se querelló ante el DACo. Aunque de la resolución de esa agencia se desprende que se celebraron varias asambleas de titulares en las que se discutieron los pormenores del contrato en cuestión, lo cierto es que en el expediente no hay copia de ninguna de las actas que se redactaron luego de acaecidas las supuestas reuniones, ni mucho menos cartas del recurrido o de algún otro titular en las que manifestaran su preocupación con la instalación del equipo en la azotea. Según la resolución del DACo, an-

tes del 24 de abril de 2001 no constaba en el libro de actas del condominio que se hubiera celebrado alguna reunión.

Tanto el recurrido como el Tribunal de Apelaciones razonaron que como el contrato en cuestión alteraba el uso y destino de un elemento común general, el consentimiento de todos los titulares era necesario. Por consiguiente, concluyeron que como no se obtuvo la aprobación unánime que exige la ley, el contrato es nulo y contra él no opera la prescripción del Art. 42(c) de la Ley Núm. 103-2003, *supra.* No tienen razón.

 El legislador fue enfático cuando aclaró que siempre que el acuerdo esté permitido por la ley, se podrá cuestionar en el plazo establecido en el citado Art. 42(c). Estamos ante una acción anulable, no nula de por sí como serían los casos en los que la Junta de Directores o el Consejo de Titulares realizan un acto que veda la ley.

Ahora bien, el titular que desee impugnar un acuerdo deberá ser diligente en procurar su derecho. Tendrá la obligación de ejercerlo o reclamarlo dentro del término de dos años que dispone el Art. 42(c), cuando se trate de acuerdos que permita la ley. Para ello es irrelevante si se requiere unanimidad o no. Sin embargo, cuando se trate de cuestionar acuerdos o acciones que la ley prohíbe totalmente no habrá obstáculos prescriptivos para ejercer la impugnación, independientemente del favor de los titulares.

En la situación particular que nos ocupa, estamos ante un acuerdo que la ley permite realizar, aunque con el consentimiento unánime de todos los titulares. Por ello, al acuerdo en cuestión le aplica el término de prescripción de dos años que dispone el Art. 42(c) de la Ley de Condominios, *supra.*

 Aunque reconocemos que las acciones de impugnación de acuerdos, acciones u omisiones de la Junta de Directores o del Consejo de Titulares admiten interrupción, igual que cualquier otro término prescriptivo, lo cierto es que en el expediente no hay evidencia que nos

permita concluir que el recurrido Pereira Sánchez interrumpió el término. Estamos de acuerdo con lo expresado en la opinión disidente de la Jueza Asociada Señora Fiol Matta, en cuanto a que el término prescriptivo de dos años dispuesto en el Art. 42(c) de la Ley Núm. 103-2003, *supra*, se cuenta a partir de la fecha de su vigencia, es decir, a partir del 4 de julio de 2003. Ello es así porque, evidentemente, no podemos aplicarle a un acto que ocurrió con anterioridad a la vigencia de una ley un término que dispuso una ley posterior al evento, con el efecto de privar a una persona de una causa de acción antes de que pueda ejercerla. Véase *Alicea v. Córdova*, 117 D.P.R. 676, 696 (1986). La retroactividad de la ley de 2003 significa que sus disposiciones, como el término prescriptivo del Art. 42(c), *supra*, aplican a los actos y acuerdos tomados antes de la vigencia de la ley en los inmuebles sometidos al régimen de propiedad horizontal. No significa que el nuevo término de prescripción del Art. 42(c) comience a contar desde antes de la vigencia de la ley, pues hasta ese momento no se podía ejercer la acción.

Ahora bien, diferimos de la conclusión a la que llega la opinión disidente en cuanto a que el plazo de dos años que tenía el señor Pereira Suárez para impugnar el contrato ante el DACo, contándolo a partir de la fecha de vigencia de la Ley Núm. 103-2003, *supra*, quedó interrumpido por la querella que alegadamente se presentó en enero de 2003 y se reanudó en noviembre de 2004 cuando el DACo denegó la moción de reconsideración.

 La opinión disidente fundamenta su teoría a base de una alegada querella de la cual no hay constancia en el expediente de este caso. Cabe recordar que es principio rector que meras alegaciones y teorías, como tampoco argumentos forenses, constituyen prueba. *Alberty v. Bco. Gub. de Fomento*, 149 D.P.R. 655, 671 (1999); *Pueblo v. Amparo*, 146 D.P.R. 467, 478 esc. 1 (1998); *Pressure Vessels P.R. v. Empire Gas P.R.*, 137 D.P.R. 497 (1994); *Ramos,*

*Escobales v. García, González,* 134 D.P.R. 969 (1993); *Defendini Collazo et al. v. E.L.A., Cotto,* 134 D.P.R. 28 (1993). "Hemos sostenido que la obligación de presentar evidencia *recae principalmente sobre la parte que sostiene la afirmativa en la cuestión en controversia.* Meras alegaciones o teorías no constituyen prueba." (Énfasis suplido y escolio omitido.) *Reece Corp. v. Ariela, Inc.,* 122 D.P.R. 270, 286 (1988), citando a *Asoc. Auténtica Empl. v. Municipio de Bayamón,* 111 D.P.R. 527, 531 (1981). Véanse, también: Regla 110(b) de Evidencia de 2009 (32 L.P.R.A. Ap. VI) y Regla 10(B) de Evidencia de 1979 (32 L.P.R.A. Ap. IV) ("La obligación de presentar evidencia primeramente recae sobre la parte que sostiene la afirmativa en la cuestión en controversia"). "[Q]uien sólo niega la existencia de algo no debe sufrir la carga de presentar evidencia; considérese el caso de quien niega la existencia de centauros, sirenas y cosas similares." E.L. Chiesa, *Tratado de derecho probatorio: Reglas de Evidencia de Puerto Rico y federales,* EE.UU., Pubs. J.T.S., 2005, T. II, Sec. 14.8(B), pág. 1110. No vemos razón para que el mismo principio no aplique en un procedimiento administrativo. Véase, por ejemplo, Sec. 556(d), *Administrative Procedure Act* (A.P.A.), 5 U.S.C.A. sec. 556(d).

> Es propio concluir que existe la obligación de presentar toda la evidencia pertinente ante la agencia. De soslayarse la presentación de cuestiones y de evidencia pertinente disponible a la parte puede significar la renuncia a su presentación. Es un principio básico en este campo con mucha solera que toda la evidencia pertinente disponible tiene que ser presentada primeramente ante la agencia. Cualquier cuestión que no haya sido traída ante la consideración de la agencia no podrá ser objeto de revisión por el tribunal. La revisión de la actuación administrativa se contrae tanto al récord como a las cuestiones que se le plantearon al organismo. Permea este precepto las doctrinas de la jurisdicción primaria y del agotamiento de los remedios. Se le ha negado a la agencia la oportunidad de enfrentarse a esa cuestión, y de corregir cualquier apreciación de la prueba. El resultado neto de la actuación judicial, que considera evidencia nunca antes presentada ante el orga-

nismo administrativo, es la usurpación de la función adjudicativa de la agencia en primera instancia. (Escolios omitidos.) D. Fernández Quiñones, *Derecho administrativo y Ley de Procedimiento Administrativo Uniforme*, 2da ed., Colombia, Forum, 2001, Sec. 4.2, pág. 160.

En conclusión, ante la ausencia de prueba de su existencia, no podemos atribuirle peso a una supuesta querella cuyo alcance desconocemos y de la cual el señor Pereira Suárez no incluyó copia en el expediente de este caso. Recordemos que Crown Castle adujo en su alegato ante este Tribunal que desconocía de la querella, pues nunca se hizo alusión a ella durante todo el procedimiento administrativo y judicial ni forma parte del expediente del caso. Ante esta alegación, lo menos que debió hacer el señor Pereira Suárez, como querellante en el DACo, era presentar prueba de que ese hecho ocurrió. Ni siquiera le pidió al DACo que tomara conocimiento de la alegada querella anterior.

No lo hizo por una sola razón: El recurrido Pereira Suárez nunca alegó que hubiera interrumpido el término prescriptivo del Art. 42(c), *supra*. Su defensa se basó exclusivamente en que el acto impugnado era nulo y, por lo tanto, no le aplica el plazo de prescripción del citado Art. 42(c).

 Es norma reiterada "que los dictámenes de los organismos administrativos merecen la mayor deferencia judicial". *Calderón Otero v. C.F.S.E.*, 181 D.P.R. 386, 395 (2011). Véanse, además: *Asoc. Fcias. v. Caribe Specialty et al. II*, 179 D.P.R. 923 (2010); *Otero v. Toyota*, 163 D.P.R. 716 (2005). Esto es así, pues "son ellas las que cuentan con el conocimiento experto y con la experiencia especializada de los asuntos que les son encomendados". *Otero v. Toyota*, íd., pág. 727. Véanse, además: *Rebollo v. Yiyi Motors*, 161 D.P.R. 69, 78 (2004); *Pacheco v. Estancias*, 160 D.P.R. 409, 431 (2003). Por ello, "[l]os tribunales no deben intervenir con las determinaciones de hecho de un organismo administrativo *si las mismas están sostenidas*

*por evidencia sustancial que surja del expediente adminis-*
*trativo considerado en su totalidad"*. (Énfasis suplido.) *Do-*
*mínguez v. Caguas Expressway Motors,* 148 D.P.R. 387,
397 (1999). Véanse, además: *Calderón Otero v. C.F.S.E.,*
supra; *Borschow Hosp. v. Jta. de Planificación,* 177 D.P.R.
545 (2009); *JP, Plaza Santa Isabel v. Cordero Badillo,* 177
D.P.R. 177 (2009); *Metropolitana S.E. v. A.R.Pe.,* 138
D.P.R. 200 (1995). Véase, también, Sec. 4.5 de la Ley de
Procedimiento Administrativo Uniforme (L.P.A.U.), 3
L.P.R.A. sec. 2175.([5]) La evidencia sustancial es " 'aquella
evidencia relevante que una mente razonable podría acep-
tar como adecuada para sostener una conclusión' ". *Otero v.*
*Toyota,* supra, pág. 728, citando a *Misión Ind. P.R. v. J.P.,*
146 D.P.R. 64, 131 (1998). Véase, además, *Hilton Hotels v.*
*Junta de Salario Mínimo,* 74 D.P.R. 670, 687 (1953).

Ahora bien, la deferencia a las agencias adminis-
trativas en sus determinaciones de hecho *no es absoluta.*
Por consiguiente, "[e]l tribunal podrá sustituir el criterio
de la agencia por el propio sólo cuando no pueda hallar una
base racional para explicar la decisión administrativa".
*Misión Ind. P.R. v. J.P.,* supra, págs. 134–135.

No obstante lo anterior, hemos dicho que quien
quiera probar que las determinaciones de hecho de una
agencia no se sostienen en el expediente debe demostrar
que " 'existe otra prueba en el récord que razonablemente
reduzca o menoscabe el peso de tal evidencia, hasta el
punto de que un tribunal no pueda, concienzudamente,

---

([5]) *"Sec. 2175. Revisión-Alcance*

"El tribunal podrá conceder el remedio apropiado si determina que el recurrente
tiene derecho a un remedio.

"Las determinaciones de hechos de las decisiones de las agencias serán sosteni-
das por el tribunal, si se basan en evidencia sustancial que obra en el expediente
administrativo.

"Las conclusiones de derecho serán revisables en todos sus aspectos por el
tribunal." Sec. 4.5 de la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A.
sec. 2175.

concluir que la evidencia sea sustancial, en vista de la prueba presentada y hasta el punto que se demuestre claramente que la decisión [del organismo administrativo] no está justificada por una evaluación justa del peso de la prueba que tuvo ante su consideración' ". *Domínguez v. Caguas Expressway Motors*, supra, pág. 398, citando a *Hilton Hotels v. Junta Salario Mínimo*, supra, págs. 686. "Si en la solicitud de revisión la parte afectada no demuestra la existencia de esa otra prueba, las determinaciones de hecho de la agencia deben ser sostenidas por el tribunal revisor." *Domínguez v. Caguas Expressway Motors*, supra, pág. 398. Véase, además, *Ramírez v. Depto. de Salud*, 147 D.P.R. 901 (1999). Por último, cabe señalar que en cuanto a las "conclusiones de derecho de la agencia, distinto de las determinaciones de hecho, el tribunal las puede revisar en todos sus aspectos, sin sujeción a norma o criterio alguno". *Rebollo v. Yiyi Motors*, supra, pág. 77. Véase, además, la Sec. 4.5 de la L.P.A.U., *supra.*

El expediente ante nuestra consideración se encuentra huérfano de prueba que sostenga que el señor Pereira Suárez manifestó, formal o informalmente, su malestar con el equipo tan pronto se enteró de su instalación en la azotea. La supuesta manifestación de inconformidad con el equipo no se sostiene con cartas, ni mucho menos con algún testimonio de los que asistieron a la vista administrativa.

Como expresáramos, los tribunales tenemos la potestad de intervenir con las decisiones de las agencias administrativas cuando sus conclusiones de hecho *no se sustentan con la prueba que obra en el expediente*. Precisamente eso es lo que pasa aquí. No se pasó prueba de una interrupción del plazo, así que no podemos concluir si las gestiones que realizó el señor Pereira Suárez, en efecto, interrumpieron la prescripción. Correspondía a este último probar la interrupción, pero no lo hizo. Ni siquiera la alegó como defensa, pues su teoría siempre fue que no había término que

aplicara a la situación acaecida porque se trataba de un acto nulo.

Asimismo, a pesar de que la doctrina exige que la parte afectada demuestre que existe otra prueba en el expediente que razonablemente reduzca o menoscabe el peso de la determinación de hecho que adoptó la agencia, lo cierto es que, en este caso, el expediente carece de prueba documental o testimonial que demuestre que se llevó a cabo la interrupción extrajudicialmente.

La opinión disidente sustenta la interrupción del término prescriptivo en la alegación desprovista de prueba respecto a la presentación de la querella el 3 de enero de 2003. Esa alegación fue rechazada por la parte peticionaria en su alegato ante este Tribunal y la parte recurrida nunca la invocó como defensa. Solo lo mencionó en su alegato de réplica pero no nos colocó en posición de concluir que, en efecto, esa querella sí se presentó. Por ello, ¿cómo le vamos a exigir a Crown Castle que pruebe que no ocurrió lo que ni siquiera el señor Pereira Suárez aduce? La opinión disidente sostiene también que debemos considerar que "los foros inferiores ... no discutieron la prueba sobre la interrupción del plazo porque pensaban que no había tal plazo". Opinión disidente, pág. 531. Sin embargo, omite que desde que Crown Castle intervino en este pleito adujo siempre la defensa de prescripción. Por ello, el señor Pereira Suárez tuvo la oportunidad de alegar, aunque fuera en la alternativa, si según los fundamentos de prescripción que adujo Crown Castle hubo interrupción del término de prescripción. En cambio, prefirió alegar una sola defensa-nulidad-y descartó alegar interrupción del plazo dispuesto en el Art. 42(c) de la Ley Núm. 103-2003, *supra*. Nuestra función es clara: interpretar la ley. No podemos suplir las defensas que las partes omiten o renuncian.[6]

---

[6] Por ello tampoco procede devolver el caso para que el Tribunal de Apelaciones evalúe los méritos del caso; ya lo hizo, a diferencia de lo que ocurrió en *Crespo Quiñones v. Santiago Velázquez*, 176 D.P.R. 408 (2009), que cita la disidencia. Allí el

Por eso concluimos que no se alegó ni mucho menos se estableció con evidencia sustancial que obre en el expediente que el señor Pereira Suárez interrumpiera el término. Los derechos se deben procurar con premura; de lo contrario se pierden. Más aún, al contar el término a partir del 4 de julio de 2003, fecha de vigencia de la Ley Núm. 103-2003, *supra*, tenemos que concluir forzosamente que el recurrido Pereira Suárez presentó su querella en DACo fuera del término que dispone el Art. 42(c) de la Ley Núm. 103-2003, *supra*. Esto es así, pues la única querella que tenemos ante nos es de 2 de septiembre de 2005, dos años y casi dos meses después de la vigencia de la ley. Por eso, al esperar más de dos años para acudir al DACo a impugnar la decisión de la Junta de Directores, el recurrido perdió su causa de acción.

Según todo lo anterior, concluimos que la acción de impugnación que presentó el recurrido estaba prescrita. En vista del resultado al que llegamos, se hace innecesario discutir los demás errores planteados.

## IV

Por los fundamentos expuestos, *se revoca la sentencia que emitió el Tribunal de Apelaciones. En su lugar, se deja sin efecto la orden del DACo y se ordena el archivo, por prescripción, de la acción de impugnación del acuerdo de la Junta de Directores del Condominio Ponciana.*

*Se dictará sentencia de conformidad.*

La Jueza Asociada Señora Fiol Matta emitió una opinión concurrente y disidente, a la cual se unieron el Juez Presidente Señor Hernández Denton y la Juez Asociada Señora Rodríguez Rodríguez.

---

Tribunal de Apelaciones se declaró sin jurisdicción y no atendió los méritos del recurso. Por eso lo devolvimos al revocar.

— o —

Opinión concurrente y disidente emitida por la Jueza Asociada Señora Fiol Matta, a la cual se unen el Juez Presidente Señor Hernández Denton y la Juez Asociada Señora Rodríguez Rodríguez.

La Opinión mayoritaria resuelve correctamente la cuestión general de Derecho ante nuestra consideración: el término prescriptivo de dos años establecido en el Artículo 42(c) de la Ley de Condominios de 2003 aplica a la impugnación de actos que requieren el consentimiento unánime de los condóminos para su aprobación pero se realizan sin obtenerlo. También es correcta su conclusión de que dicho periodo prescriptivo aplica a partir de la fecha de vigencia de esa Ley, el 4 de julio de 2003. Sin embargo, la Opinión falla al no considerar la probable interrupción de ese término prescriptivo en este caso y al colocar en el recurrido el peso de probar que su acción no prescribió, obviando que la prescripción es una defensa que presenta el peticionario y que es éste quien está llamado a asumir el peso de probarla.

La controversia del recurso se resume en si estaba prescrita una acción para impugnar un contrato de arrendamiento exclusivo e ilimitado para instalar y operar equipos de telecomunicaciones en la azotea de un condominio. Este contrato con la compañía Crown Castle International (Crown Castle) lo firmó el presidente de la Junta de Directores del Condominio Ponciana sin el consentimiento ni el conocimiento de los titulares de los apartamentos. La impugnación ante el Departamento de Asuntos del Consumidor (DACo) la presentó uno de los condóminos, casi seis años y medio después del acuerdo.

# I

El señor Miguel Pereira Suárez vivía en el *penthouse* del Condominio Ponciana, en Ponce, cuando, cerca de finales de marzo de 1999, vio que estaban colocando unas antenas en la azotea de su edificio, sometido al régimen de propiedad horizontal desde 1971. Según las determinaciones de hecho del DACo, agencia ante la cual se querelló Pereira Suárez, tan pronto él se percató de la instalación de las antenas, manifestó verbalmente su objeción al entonces administrador del Condominio, quien le indicó que se celebraría una reunión del Consejo de Titulares para discutir el asunto.(¹) No obstante, no se celebraron asambleas del Consejo para discutir las preocupaciones de los condóminos respecto al contrato sino hasta el 24 de abril de 2001.(²) Las objeciones de los titulares se volvieron a discutir en otra asamblea del Consejo, el 27 de noviembre de 2001.(³) Por último, el 2 de abril de 2002, se llevó a cabo una tercera reunión del Consejo, en la que la presidenta Laboy advirtió que Crown Castle no accedió a remover las antenas y el Condominio no tenía dinero para obligarla a hacerlo legalmente, por lo que recomendaba a los titulares interesados que se querellaran personalmente.(⁴) Así lo

---

(¹) Determinación de hecho 10 del DACo, Apéndice de la Petición de *certiorari*, pág. 43. La Opinión mayoritaria menciona esta determinación de hecho como una mera alegación. La transcripción de la vista en el DACo no se incluyó en el Apéndice de la Petición de *certiorari*. Los detalles de los testimonios ante la agencia surgen de la Resolución del DACo y de los alegatos de las partes.

(²) Determinación de hecho 11 del DACo, Apéndice de la Petición de *certiorari*, pág. 43. La Resolución del DACo identifica como *exhibit* el Libro de Actas del Condominio, pero no se incluyó copia de éste en el Apéndice de la Petición de *certiorari*. Asimismo, el peticionario informa que el Condominio Ponciana no tiene actas de reuniones anteriores al 2001. Petición de *certiorari*, pág. 6.

(³) Determinaciones de hechos 12 y 13 del DACo, Apéndice de la Petición de *certiorari*, págs. 43–44; Conclusiones del DACo, Apéndice de la Petición de *certiorari*, págs. 50–51.

(⁴) Determinación de hecho 14 del DACo, Apéndice de la Petición de *certiorari*, pág. 44. Nótese que Crown Castle, al menos desde el 2002, estaba al tanto de las objeciones de los condóminos. No las conoció por primera vez al recibir la notificación

hizo Pereira Suárez el 3 de enero de 2003, al presentar una querella en el DACo en la cual impugnó los actos de la Junta.(⁵) El 30 de junio de 2004, la agencia archivó sin perjuicio la querella por falta de trámite, y denegó una moción de reconsideración de Pereira Suárez el 8 de noviembre de 2004.

Pereira Suárez presentó nuevamente su querella contra la Junta el 2 de septiembre de 2005. Solicitó que se declarara nulo el contrato de arrendamiento de la azotea y se removieran los equipos. Enmendó la querella el 3 de marzo de 2006 para incluir a Crown Castle como querellado.(⁶) El 4 de abril de 2007, Crown Castle solicitó que se le considerara parte interventora en el procedimiento administrativo y pidió su desestimación por prescripción.(⁷) El DACo declaró nulo el contrato, basado en el requisito de consentimiento unánime de los titulares para conferir derechos sobre elementos comunes generales, establecido en la Ley de Condominios de 2003.(⁸)

---

de la segunda querella de Pereira Suárez.

(⁵) No hay copia de esta querella ni de la Resolución del DACo sobre ésta en el expediente, pero se menciona en el Alegato de Réplica del recurrido ante el Tribunal Supremo, pág. 9, y en la Moción en Cumplimiento de Orden de la Junta de Directores del Condominio Ponciana ante el Tribunal de Apelaciones, págs. 1 y 2, en el expediente del caso en el foro apelativo sin numerar. Está identificada como Querella Núm. 600004623.

(⁶) Querella Núm. 100029153, Apéndice de la Petición de *certiorari*, págs. 1–4.

(⁷) Apéndice de la Petición de *certiorari*, págs. 8–16. Crown Castle alegó que la querella estaba prescrita según el Artículo 42(c) de la Ley de Condominios de 2003, si no aplicaba el término de treinta días que proveía la Ley de Propiedad Horizontal anterior para impugnar acuerdos del Consejo de Titulares o de la Junta de Directores. Debemos aclarar que ese término prescriptivo de la antigua ley no le aplicaba a casos como el presente, en que se altera el uso de un elemento común del condominio. Véase *Brown III v. J.D. Cond. Playa Grande*, 154 D.P.R. 225 (2001).

(⁸) Resolución del DACo, Apéndice de la Petición de *certiorari*, págs. 41–55. Sobre el requisito de unanimidad, véanse: Art. 11 de la Ley de Condominios de 2003 (31 L.P.R.A. sec. 1291), y *Rivera Rodríguez v. Junta Dir. I y II*, 173 D.P.R. 475 (2008). El DACo ordenó a la Junta de Directores que celebrara una asamblea del Consejo de Titulares en la que decidieran por unanimidad si ratificarían el contrato o exigirían la remoción de las antenas. Sobre los contratos inexistentes que pueden comenzar a surtir efectos una vez los ratifique quien debía consentir al negocio, véanse: Art. 1211 del Código Civil, 31 L.P.R.A. sec. 3376, y *Soto v. Rivera*, 144 D.P.R. 500, 514–516 (1997).

El mismo análisis utilizó el Tribunal de Apelaciones para confirmar el dictamen de la agencia administrativa, afirmando que el contrato de arrendamiento sin el consentimiento unánime de los titulares fue un acto *ultra vires* y nulo en Derecho, por lo cual no se activó término prescriptivo alguno para reclamar su corrección.(⁹)

El interventor Crown Castle recurrió a este Tribunal para que se revocaran esas decisiones y se declarara prescrita la acción del señor Pereira Suárez, en virtud del Artículo 42(c) de la Ley de Condominios de 2003, *supra*.(¹⁰) Así lo resuelve la Opinión mayoritaria y, por los fundamentos que paso a exponer, disiento.

---

(⁹) *Pereira Suárez v. Junta Directores Condominio Ponciana v. Banco Santander, Crown Castle International Corp.*, Sentencia del Tribunal de Apelaciones KL-RA200800029, 27 de agosto de 2008, Apéndice de la Petición de *certiorari*, págs. 122–134. El foro apelativo también usó como fundamento nuestra decisión en *Rivera Rodríguez v. Junta Dir. I y II*, supra. Ahí establecimos que un contrato en el cual se arrienda parte de la azotea del condominio a una compañía comercial de telecomunicaciones para colocar antenas y otros equipos, aprobado sin el consentimiento unánime de los residentes, es nulo porque está prohibido ceder derechos sobre el uso de los elementos comunes del inmueble sin la aprobación de todos los titulares. Para resolver el presente caso hace falta determinar si se presentó dentro del término prescriptivo. Entonces, se analizaría si procede anular el contrato de acuerdo con el precedente de *Rivera Rodríguez*, que tiene hechos muy similares. Podemos resaltar cuatro diferencias entre ambos casos: (1) en *Rivera Rodríguez*, el edificio era residencial, mientras que el Condominio Ponciana es residencial y comercial; (2) en *Rivera Rodríguez*, el contrato tenía un término menor de seis años, y aquí el arrendamiento es por más de seis años, lo que se considera un acto de enajenación de la azotea en la que los residentes mantienen sus propias antenas y los compresores de sus acondicionadores de aire; (3) en *Rivera Rodríguez*, una mayoría de los titulares había aprobado el contrato impugnado antes de su firma, mientras que a los residentes del Condominio Ponciana no se les informó sobre el arrendamiento, y (4) el peticionario Rivera Rodríguez presentó su querella en el DACo poco más de un mes después del acuerdo; el recurrido Pereira Suárez tardó varios años. Véanse: Art. 11 de la Ley de Condominios de 2003 (31 L.P.R.A. sec. 1291i(b)) (sobre la imposibilidad de enajenar elementos comunes generales como áreas privadas), y la Opinión disidente del Juez Presidente Señor Hernández Denton en *Rivera Rodríguez*, supra, págs. 495–498.

(¹⁰) El peticionario también planteó como error que se utilizara la decisión de *Rivera Rodríguez v. Junta Dir. I y II*, supra, para resolver este caso, pues alega que aquél solo aplica a condominios exclusivamente residenciales y el Condominio Ponciana es mixto, con los primeros cinco de sus doce pisos dedicados a usos comerciales. Debido a que la Opinión mayoritaria no atiende dicho planteamiento y su relevancia va a depender de la determinación sobre prescripción, no discutiremos ese señalamiento de error.

## II

De acuerdo con la Ley de la Propiedad Horizontal de 1976, vigente cuando se realizó el contrato y se celebraron las reuniones del Consejo de Titulares, no había límite de tiempo para impugnar actos que requerían la aprobación unánime de los titulares y se llevaron a cabo sin ella. Para evitar que la falta de plazo permitiera que las actividades que los condóminos habían aceptado por muchos años se cuestionaran después, la Ley de Condominios de 2003 exigió a los titulares ser diligentes en sus reclamos a través del establecimiento de un término prescriptivo de dos años. Con ello se buscó brindar estabilidad al régimen y prevenir querellas frívolas de quienes habían dado su consentimiento tácito a cambios que, siendo evidentes por largo tiempo, objetaron tardíamente.[11]

Amparados en ese propósito de la ley de 2003 y en que ésta aplicaría a todos los inmuebles sometidos al régimen de propiedad horizontal sin importar la fecha de su constitución, establecimos la aplicación retroactiva de sus disposiciones en *Consejo Titulares v. Williams Hospitality*, 168 D.P.R. 101 (2006). Sin embargo, aclaramos en ese caso que la retroactividad de la ley de 2003 dependería de la situación y no se extendería a relaciones jurídicas surgidas antes de la vigencia de la nueva ley si con ello se afectaban derechos adquiridos por los titulares.[12]

En el caso que ahora nos ocupa, resolvemos que los términos prescriptivos dispuestos en la ley de 2003 se cuentan a partir de su fecha de vigencia, el 4 de julio de 2003, que es noventa días después de su aprobación.[13] De ese modo, se evitan situaciones absurdas en las que el término

---

[11] M.J. Godreau, *La nueva Ley de Condominios*, 2da ed., San Juan, Ed. Dictum, 2003, págs. 28–30.

[12] *Consejo Titulares v. Williams Hospitality*, 168 D.P.R. 101, 110 (2006). Véase, también, *Serrano Muñoz v. Auxilio Mutuo*, 171 D.P.R. 717, 728 esc. 15 (2007).

[13] Art. 44 de la Ley de Condominios de 2003 Ley 103-2003 (2003 Leyes de Puerto Rico 355, 405).

prescriptivo de la acción empiece y termine de transcurrir antes de que ese término prescriptivo exista, como sucedería en este caso si el plazo de dos años se contara a partir del contrato de 1999.

Una norma básica de nuestro ordenamiento es la que dicta que las leyes, de ordinario, no tienen efecto retroactivo. Cuando un estatuto dispone lo contrario, ese efecto retroactivo no puede perjudicar los derechos adquiridos al amparo de una ley anterior.[14] Ese precepto se basa en que la ciudadanía necesita tener seguridad sobre las consecuencias de su comportamiento y solo las relaciones jurídicas que caen bajo la vigencia de una regla deben estar gobernadas por ella.[15] Es por ello que, en palabras del Juez Asociado Señor Negrón García, "en nuestra democracia rige el principio de la irretroactividad, las leyes miran hacia el porvenir, no hacia el pasado".[16]

En *Alicea v. Córdova*, 117 D.P.R. 676, 696 (1986), citando jurisprudencia estadounidense, establecimos que "[s]i el estatuto opera inmediatamente para eliminar el remedio existente, o dentro de un periodo de tiempo tan corto que no le da a la parte perjudicada una oportunidad razonable para ejercitar la acción, el estatuto es inconstitucional". Igualmente, el tratadista español Luis Díez-Picazo explica que, cuando una ley nueva establece un período prescriptivo más breve para una acción que tenía un término más largo bajo la ley vigente cuando surgió la acción, opera una "retroactividad mínima".[17] Según esa teoría, está permitido que los derechos nacidos según la ley anterior se rijan por la prescripción de la ley nueva, pero

---

[14] Art. 3 del Código Civil, 31 L.P.R.A. sec. 3.

[15] (Citas omitidas.) *Vázquez v. Morales*, 114 D.P.R. 822, 826 (1983).

[16] A.S. Negrón García, "El Caño: ley inconstitucional no es Derecho", en: Opinión, *El Nuevo Día*, 24 de junio de 2009. Véanse, también: Juramentación del Hon. Luis F. Estrella Martínez, 181 D.P.R. IX (2011); *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. 1, 130 (2010), opinión disidente de la Jueza Asociada Señora Fiol Matta.

[17] L. Díez-Picazo, *La prescripción extintiva en el Código Civil y en la jurisprudencia del Tribunal Supremo*, 2da ed., Navarra, Ed. Thomson Civitas, 2007, pág. 49.

solo desde que el nuevo término prescriptivo esté en vigor. Esto es, que el transcurso del período más reciente y más corto se cuenta desde la vigencia de la ley que lo establece y no desde que existe la causa de acción. Asimismo, no se puede sumar el tiempo que transcurrió bajo la ley anterior al que haya pasado bajo la ley nueva para completar el plazo más breve.[18]

El Artículo 42(c) de la Ley de Condominios de 2003 dispone que: "[l]a acción de impugnación de acuerdos, acciones u omisiones de la Junta de Directores, del Consejo de Titulares, con excepción de los realizados por el titular que somete el inmueble al régimen, que violen las disposiciones de esta Ley, de la escritura matriz o del Reglamento del condominio, prescribirá a los dos (2) años de haberse notificado el acuerdo, tomado la acción o de conocerse la omisión." [19]

Cabe señalar que dudamos, incluso, que este artículo aplique a los hechos de este caso, pues se refiere a acuerdos tomados por el Consejo de Titulares o la Junta de Directores y el contrato en cuestión aparenta haber sido otorgado unilateralmente por el presidente, sin la intervención de la Junta y sin notificar a los titulares, ni siquiera posteriormente.[20] Recordemos que el entonces presidente de la Junta de Directores del Condominio, Ángel Llavona Folguera, firmó el contrato con Crown Castle para que ésta mantuviera y operara las antenas por un plazo de veinticinco años, prorrogable por veinticinco años más, a cambio de un canon mensual de $700.[21] Según las determinaciones de hecho del DACo, aunque Llavona Folguera aparece

---

[18] Íd., págs. 49–51.

[19] Art. 42 de la Ley de Condominios, *supra*, pág. 403.

[20] Véanse: Arts. 38–38E de la Ley de Condominios de 2003 (31 L.P.R.A. secs. 1293b–1293b-4A).

[21] El contrato no se incluyó en el Apéndice de la Petición de *certiorari*. Los detalles del acuerdo surgen de las Determinaciones de hecho 6 y 8 de la Resolución del DACo de 1 de noviembre de 2007, Apéndice de la Petición de *certiorari*, pág. 42, y de los alegatos de las partes.

como representante de la Asociación de Propietarios de Ponciana en el documento del acuerdo, el Consejo de Titulares no lo había autorizado realizar el pacto.[22] No surge del expediente que el resto de la Junta de Directores hubiese aprobado tal acuerdo ni que posteriormente se hubiese informado de éste a los titulares de los apartamentos. Además, en la misma fecha, Llavona Folguera, en su carácter individual, otorgó otro contrato con Crown Castle, en el que le arrendó, por $1,300 mensuales, un apartamento comercial suyo en el quinto piso del Condominio para que colocara unos equipos que se conectan a las antenas mediante unos cables que corren por la pared exterior del edificio.[23] Por ello, en la segunda asamblea del Consejo de Titulares —en noviembre de 2001— la nueva presidenta de la Junta, Olga Laboy, informó que Llavona Folguera firmó el contrato sobre las antenas sin endosos y con un claro conflicto de intereses.[24] Ante estos hechos, se debería evaluar prueba para determinar si el contrato es realmente anulable o es definitivamente nulo, en cuyo caso no aplicaría el término prescriptivo que estamos analizando.

Poniendo a un lado esa preocupación, no hay duda de que el término prescriptivo mencionado se debe emplear cuando se impugnen acciones permitidas que, aunque requieren el consentimiento unánime de los titulares, se llevan a cabo sin esa aprobación, *sin que los condóminos las objeten al enterarse.* Ello responde al propósito de la ley, que, como hemos indicado y expone correctamente la Opinión mayoritaria, establece ese plazo para evitar que se afecte el ambiente de sana convivencia en el condominio y que se desaprueben decisiones que se presumían acepta-

---

[22] Determinaciones de hecho 6 y 7 del DACo, Apéndice de la Petición de *certiorari*, pág. 42.

[23] Determinación de hecho 9 del DACo, Apéndice de la Petición de *certiorari*, pág. 43.

[24] Determinaciones de hecho 11 y 12 del DACo, Apéndice de la Petición de *certiorari*, pág. 43.

das por no haber encontrado oposición en años.(²⁵) Así, desde el 2003, los actos que se pueden llevar a cabo con el aval de la totalidad de los titulares y se ejecutan sin la aprobación de todos ellos no son nulos sino anulables. El titular que desee que se anule el acuerdo tiene que reclamarlo dentro del período de dos años a partir de que se tomó la decisión, se le notificó o tuvo conocimiento de ésta.

La Opinión mayoritaria concluye correctamente que las disposiciones de la ley de 2003 sobre nuevos términos prescriptivos para presentar reclamaciones aplican a todos los inmuebles sometidos al régimen de propiedad horizontal —sin importar la fecha en que se sometieron al régimen— a partir de la fecha de vigencia de la Ley de Condominios. Siendo ello así, y asumiendo que también sea correcta su conclusión en cuanto a la naturaleza anulable del contrato entre el presidente de la Junta de Directores del Condominio y Crown Castle, el plazo de dos años que tenía Pereira Suárez para impugnar el contrato ante el DACo empezó a transcurrir el 4 de julio de 2003. Ahora bien, la mayoría se equivoca al resolver que ese plazo no se interrumpió. Por el contrario, como no se resolvió la querella que Pereira Suárez presentó en enero de 2003 —cuando no existía término para ejercer la acción— el periodo prescriptivo quedó en suspenso y no volvió a correr hasta noviembre de 2004, cuando el DACo le denegó la reconsideración del archivo sin perjuicio de esa querella. Por eso, debemos reconocer que la segunda querella, en septiembre de 2005, se presentó dentro del nuevo término de dos años.

### III

La Opinión mayoritaria dice que no hay prueba en el expediente que permita concluir que las gestiones que realizó el recurrido Pereira Suárez interrumpieron la pres-

---

(²⁵) Véase Opinión mayoritaria, pág. 501.

cripción, por lo que procede el archivo por prescripción de la acción de impugnación en este caso. Entiendo que esa conclusión es equivocada.

Sabemos que el transcurso del tiempo por sí mismo no tiene relevancia jurídica; se requiere también que la persona esté al tanto de que tiene a su disposición una acción para hacer valer un derecho y no actúe respecto a ésta.[26] Según las alegaciones de Pereira Suárez, tomadas como ciertas por el DACo, él se quejó con miembros de la Junta de Directores desde que se comenzaron a colocar las antenas y éstos no tomaron acción al respecto. Aunque sus argumentos van dirigidos a que se declare nulo el contrato, no deja de ser cierto que, como testificó ante el DACo, "[u]na y otra vez, informalmente y formalmente, expresó su desacuerdo con la instalación de dichas antenas".[27] De acuerdo con las determinaciones de hecho del DACo, el señor Pereira Suárez no se cruzó de brazos. Si la presentación formal de su reclamación se retrasó fue debido a la inacción de la Junta. Cuando se quejó de la instalación se le dijo que el asunto se discutiría en una asamblea de titulares y ésta no se celebró hasta abril de 2001. Igualmente, cuando los residentes votaron por cancelar el contrato con Crown Castle, la presidenta de la Junta le informó que no llevaría a cabo la encomienda porque no tenía presupuesto para ello. Cabe mencionar que, hasta la tercera reunión, el recurrido estuvo participando de un proceso interno para tratar de solucionar la controversia, que es uno de los objetivos de la Ley de Condominios de 2003.[28] Mas no encontró respuesta dentro del Condominio y, a partir de que la presidenta de la Junta le informó que no podría ayudarlo, salió a buscar auxilio en el DACo. De hecho, la Re-

---

[26] G. Orozco Pardo, *La interrupción de la prescripción extintiva en el Derecho Civil*, Granada, Ed. Universidad de Granada, 1986, págs. 40–42; R. Hernández Colón, *Derecho Procesal Civil*, 4ta ed., San Juan, LexisNexis, 2007, págs. 80–87.

[27] Memorando de Derecho de Pereira Suárez ante el DACo, Apéndice de la Petición de *certiorari*, pág. 30.

[28] Godreau, *op. cit.*, págs. 39–40.

solución del DACo establece que la Junta no atendió de forma alguna los reclamos de Pereira Suárez "para resolver una situación que a todas luces era ilegal".[29]

De parte del recurrido no· hubo la inactividad que requiere la prescripción. Hemos asentado que "[n]o podemos castigar con el látigo de la prescripción a quien no incurrió en desidia ni en dejadez", pues la prescripción está diseñada para castigar la inercia.[30] Vale recalcar que el término prescriptivo de dos años de la Ley de Condominios se estableció para evitar querellas referentes a acciones que, a pesar de haber ocurrido muchos años atrás, nunca se habían objetado. En este caso sucedió todo lo contrario; *tan pronto Pereira Suárez vio que estaban colocando las antenas, se quejó y continuó quejándose.*

La prescripción es una institución que busca atender el interés general de darle certeza a las relaciones jurídicas, pero que, a la vez, tiene que ser conciliada con el interés individual de los titulares de derechos que los quieren ejercer. Para ellos se provee el mecanismo de la interrupción de la prescripción.[31] La voluntad manifestada, como actividad que rompe con la inercia en cierto período, tiene el efecto de impedir que opere la prescripción, pues la inactividad de la parte que puede reclamar es un requisito esencial para que aplique. Cualquier manifestación que demuestre inequívocamente la voluntad de ejercer un derecho se debe considerar eficaz para interrumpir el plazo prescriptivo.[32] Esa exteriorización puede darse de modo judicial o extrajudicial. Para esa segunda vía, la ley no presenta requisitos; lo importante, sea cual sea el medio

---

[29] Resolución del DACo, Apéndice de la Petición de *certiorari*, pág. 52.

[30] *De León v. Caparra Center*, 147 D.P.R. 797, 810 (1999).

[31] Orozco Pardo, *op. cit.*, págs. 57–58. Sin este mecanismo, todos los plazos serían de caducidad, es decir, fatales o inevitables.

[32] *Sánchez v. Aut. de los Puertos*, 153 D.P.R. 559, 567–569 (2001); Orozco Pardo, *op. cit.*, págs. 31–35 y 56–57; M.R. Bachiller, *La prescripción liberatoria en el Derecho Civil y Comercial*, Buenos Aires, Ed. Ad-Hoc, 1985, págs. 117–118.

utilizado, es que la manifestación recoja la voluntad de exigir algo a lo que se tiene derecho y que sea susceptible de ser probada como "cuestión de hecho de apreciación exclusiva del Tribunal de instancia".[33] También se permite que sea la parte contra quien se reclama la que interrumpa el término, mediante el reconocimiento de la deuda o el derecho del otro.[34]

El plazo prescriptivo corre a partir de que la persona se entera efectivamente del acto y puede ejercer su causa de acción.[35] Una vez se interrumpe el término, las reclamaciones sucesivas pueden prolongarlo indefinidamente.[36] Cada interrupción tiene el efecto de que el plazo prescriptivo vuelva a contar entero.[37]

Cuando Pereira Suárez presentó su primera querella en la agencia, el 3 de enero de 2003, lo hizo dentro del término que se estableció en la Ley de Condominios y comenzó a regir el 4 de julio de 2003. Los procedimientos relacionados con esa querella terminaron con su archivo *sin perjuicio* el 8 de noviembre de 2004, lo que le brindaba la posibilidad de volver a presentar la querella ante el DACo en un periodo de dos años, que terminaba en noviembre de 2006. Por lo tanto, cuando Pereira Suárez se querelló por segunda vez, el 2 de septiembre de 2005, su acción no había prescrito.

Según Bachiller, la prescripción es una defensa afirmativa que los tribunales no aplican de oficio si la parte a la que favorece no lo solicita, pero los jueces y las juezas sí pueden determinar que hubo interrupción si surge del ex-

---

[33] Orozco Pardo, *op. cit.*, pág. 195. Véanse: *Galib Frangie v. El Vocero de P.R.*, 138 D.P.R. 560, 567–568 (1995); *Acosta Quiñones v. Matos Rodríguez*, 135 D.P.R. 668, 675–676 (1994); *Zambrana Maldonado v. E.L.A.*, 129 D.P.R. 740, 750–753 (1992); Díez-Picazo, *op. cit.*, págs. 184–185; Orozco Pardo, *op. cit.*, págs. 196–197.

[34] Art. 1873 del Código Civil, 31 L.P.R.A. sec. 5303.

[35] *Vera v. Dr. Bravo*, 161 D.P.R. 308, 321–331 (2004); Bachiller, *op. cit.*, págs. 81–84.

[36] *De León v. Caparra Center*, supra, págs. 811–812.

[37] *Díaz de Diana v. A.J.A.S. Ins. Co.*, 110 D.P.R. 471, 474–475 (1980).

pediente, aunque no se haya alegado.(38) En este caso, existen suficientes indicios de que el término para impugnar quedó interrumpido. La falta de detalles en cuanto a la prescripción en el expediente no se le debe adjudicar a la persona contra quien operaría la misma, sino al propio peticionario, así como al hecho de que los foros inferiores no atendieron este asunto.

Como afirma Orozco: "En definitiva, la prescripción del derecho es lo excepcional[;] su ejercicio o conservación, lo normal, por lo que nuestro Ordenamiento debe potenciar el ejercicio y conservación de los derechos ...."(39) De hecho, la legislación moderna en los países civilistas admite expresamente la interrupción extrajudicial y su inclusión en los códigos respondió a la necesidad de reconocer la voluntad de conservación del derecho expresada por diversas vías, que era ignorada debido a la formalización excesiva del ordenamiento, que llevaba a considerar abandonada una acción aunque constara la existencia de una intención contraria.(40) Por eso, este Tribunal ha analizado de manera liberal la prueba sobre reclamaciones interruptivas.(41) Ante la falta de información o de claridad en las alegaciones sobre la consumación o interrupción del término prescriptivo, no procede la medida drástica de archivar el caso por *suponer* que prescribió. Ello milita en contra de la política de la Rama Judicial de Puerto Rico de que los ciudadanos y las ciudadanas vean las controversias que presentan resueltas en sus méritos.(42)

---

(38) Bachiller, *op. cit.*, pág. 295. Véanse, también: Díez-Picazo, *op. cit.*, págs. 95–96 y 139; Orozco Pardo, *op. cit.*, págs. 48–51.

(39) Orozco Pardo, *op. cit.*, pág. 59. Véase, también, Díez-Picazo, *op. cit.*, págs. 107–109.

(40) Díez-Picazo, *op. cit.*, págs. 33–36.

(41) Véase, por ejemplo, *Zambrana Maldonado v. E.L.A.*, supra, pág. 761.

(42) Véanse: *Ghigliotti v. A.S.A.*, 149 D.P.R. 902, 915 (1999); *López v. Porrata-Doria*, 140 D.P.R. 96 (1996).

## IV

No cabe duda de que los actos de interrupción tienen que ser probados cuando se alega que no opera la prescripción.[43] Pero ello supone que se haya reclamado *y probado* la prescripción. Por eso, es el peticionario quien tiene el peso de probar que la causa de Pereira Suárez está prescrita, demostrando que hay prueba en el expediente de la agencia administrativa que permita concluir que la decisión del DACo no está justificada.

En este punto, conviene repasar algunos conceptos básicos sobre Derecho Probatorio y Derecho Administrativo. Entre los principios sobre la evaluación y suficiencia de la prueba recopilados en las Reglas de Evidencia, se encuentran unos que son fundamentales para resolver este caso, a saber: que el peso de la prueba recae sobre la parte que resultaría vencida si no se presentara prueba, que la obligación de presentar evidencia la tiene principalmente quien sostiene la afirmativa y que, en casos civiles, no se exige que la prueba produzca certeza absoluta sobre los hechos, sino que la totalidad de la prueba haga más probable cierta conclusión.[44] En este caso, Crown Castle es quien pide que revoquemos la Sentencia del Tribunal de Apelaciones que confirmó al DACo y declaremos prescrita la acción. Por lo tanto, le corresponde asumir el peso de la prueba. Además, vista la poca prueba que obra en el expediente, parece más probable que se haya interrumpido el término prescriptivo.

Asimismo, debemos sostener las determinaciones de hecho de las agencias si están respaldadas por evidencia que razonablemente se podría considerar adecuada para sus-

---

[43] Orozco Pardo, *op. cit.*, pág. 79.

[44] Regla 110(a), (b), (c) y (f) de Evidencia de 2009 (32 L.P.R.A. Ap. VI). Aunque las Reglas de Evidencia no aplican en las vistas administrativas, sus principios fundamentales se utilizan como guías. Sec. 3.13(e) de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 2163(e).

tentar la conclusión a la que se llega.[45] Esto, más aún, cuando el peticionario no aporta evidencia que derrote la presunción de corrección que tiene la decisión administrativa.[46] Hemos establecido que la parte que impugne las determinaciones de la agencia administrativa tiene que convencer al tribunal de que la conclusión de la agencia no fue razonable de acuerdo con la totalidad de la prueba en el expediente. Si quien solicita la revisión no demuestra que existe prueba en el expediente que indica que la actuación de la agencia no se basó en evidencia sustancial, debemos respetar las determinaciones de hecho del foro administrativo y no sustituir el criterio de la agencia.[47] Esto es así porque los tribunales apelativos "no tienen la facultad de realizar determinaciones sin base en el expediente de determinado caso ante su consideración".[48]

Si el expediente del caso que presentó Crown Castle está incompleto, no podemos castigar por ello a la parte recurrida. Es el peticionario quien tiene el deber de poner a este Tribunal en posición para determinar si, en efecto, operó la prescripción que presenta como defensa y como razón para revocar al foro que tuvo ante sí la prueba directa y al que lo confirmó. Sin embargo, el peticionario ni siquiera incluyó en su recurso toda la prueba que se presentó en el DACo.[49] Se limitó a solicitar que se aclarara una norma de Derecho, el término prescriptivo aplicable, pero no aportó los documentos necesarios para poder apli-

---

(45) Sec. 4.5 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 2175; *Pacheco v. Estancias*, 160 D.P.R. 409, 431–433 (2003). Véanse, también: *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 D.P.R. 345, 356 (2009); *Ramírez Ferrer v. Conagra Foods PR*, 175 D.P.R. 799, 810–811 (2009); *García Reyes v. Cruz Auto Corp.*, 173 D.P.R. 870, 898–899 (2008).

(46) *Calderón Otero v. C.F.S.E.*, 181 D.P.R. 386, 395 (2011); *O.E.G. v. Rodríguez*, 159 D.P.R. 98, 118–119 (2003).

(47) *Otero v. Toyota*, 163 D.P.R. 716, 728 (2005).

(48) *Gutiérrez Vázquez v. Hernández y otros*, 172 D.P.R. 232, 244 (2007).

(49) Por ejemplo, en su Memorando de Derecho menciona los documentos presentados en la vista administrativa, a la que asistió, pero no los incluye en el Apéndice. Apéndice de la Petición de *certiorari*, págs. 17–28.

car esa pauta a los hechos de su caso. Siendo así, no podemos concederle el remedio que solicita.

Más aún, los escritos de ambas partes se centran en la discusión de si el acto era nulo o era anulable y le aplicaba el término prescriptivo de la Ley de Condominios. De igual forma, los foros inferiores que decretaron la nulidad no discutieron la prueba sobre la interrupción del plazo porque pensaban que no había tal plazo. No lo consideraron necesario para resolver que la acción era nula, pues la acción de nulidad absoluta es imprescriptible.[50] Además, es pertinente resaltar que esta es la primera vez que este Tribunal se expresa acerca de la aplicación del término prescriptivo de dos años de la Ley de Condominios de 2003 para impugnar acciones que antes eran estrictamente nulas. Es costumbre de este Tribunal no aplicar una norma nueva a los hechos del caso en el que se está estableciendo la misma, excepto cuando razones de alto interés público lo exijan.[51]

Lo único que este Tribunal tenía que determinar en esta etapa era si el plazo de prescripción de dos años aplica a la impugnación de actos que requerían el consentimiento unánime de los condóminos para su aprobación y se llevaron a cabo sin ésta.[52] Sin embargo, la Opinión mayoritaria, sin

---

[50] Como explica Salerno, "[s]i por motivos de orden público ciertos actos son fulminados de nulidad, no resulta congruente admitir la posibilidad de su eficacia por el transcurso de un tiempo más o menos prolongado, como un modo de dar estabilidad a una situación de hecho". M.U. Salerno, *Nulidad absoluta y prescripción*, Buenos Aires, Ed. Abeledo-Perrot, 1978, pág. 38. Por eso tampoco tuvo oportunidad el señor Pereira Suárez de presentar evidencia de la interrupción de la prescripción. El alegato del recurrido se centra en que "Crown Castle continúa exponiendo el punto de prescripción para tratar de salvar unos actos nulos". Alegato de réplica, pág. 2. Véanse, también, págs. 16–18 de ese alegato.

[51] Como ejemplo, véanse: *S.L.G. Negrón-Nieves v. Vera Monroig*, 182 D.P.R. 218 (2011); *E.L.A. v. Crespo Torres*, 180 D.P.R. 776, 799 (2011); *Westernbank v. Registradora*, 174 D.P.R. 779, 789–790 (2008); *In re Silva Iglecia*, 162 D.P.R. 105, 122 (2004); *Rafael Rosario & Assoc. v. Depto. Familia*, 157 D.P.R. 306, 331 (2002); *Bco. Des. Eco. v. AMC Surgery*, 157 D.P.R. 150, 157 (2002); *In re Marchand Quintero*, 151 D.P.R. 973, 992 (2000); *Pueblo v. Opio Opio*, 104 D.P.R. 165, 170 (1975).

[52] Recientemente resolvimos que no se debía adjudicar en los méritos un recurso en el que solo contábamos con alegatos sobre un asunto de falta de jurisdicción y devolvimos el caso para que las partes pudieran elaborar sus argumentos. *Crespo Quiñones v. Santiago Velázquez*, 176 D.P.R. 408, 417–419 (2009). Aunque en el presente caso el Tribunal de Apelaciones y el DACo evaluaron en los méritos *una* con-

contar con los elementos necesarios para ello, declara prescrita la segunda querella, presentada dos años y dos meses después del establecimiento del término prescriptivo de dos años, porque decide ignorar la probabilidad de que cuando ese término empezó a transcurrir ya se había presentado una primera querella que interrumpió el término para la segunda. No pretendo que resolvamos el asunto de la prescripción a base de "meras alegaciones" porque reconozco que las alegaciones no constituyen prueba.([53]) Mas tampoco puedo estar de acuerdo con que excluyamos sin más un hecho importante para adjudicar el caso.

Dado que en el expediente no consta la prueba necesaria para determinar si la acción está prescrita, lo que procede es devolver el caso a la agencia administrativa para que reciba y evalúe evidencia sobre el particular.([54]) De esa forma, se podrían detallar las gestiones que realizó el señor Pereira Suárez y en qué fecha se hicieron, en lugar de descartar la presentación de la primera querella, hecho que mencionaron todas las partes pero sobre el cual no se presentó prueba probablemente porque se entendió que no era pertinente para la controversia que se estaba atendiendo. Así, evitaríamos ejercer una función que le corresponde al foro primario, en detrimento de los derechos de las partes, y permitiríamos que las partes argumenten de forma clara y específica el asunto sobre la prescripción o su interrupción.([55])

---

troversia, lo concerniente a *la* controversia sobre la interrupción del término prescriptivo nunca se atendió en los foros inferiores, por lo que el resultado es el mismo que en *Crespo Quiñones* y procede que, al revocar la interpretación de Derecho que se hizo, devolvamos el recurso para que el foro primario evalúe la prueba pertinente.

([53]) Véase Opinión mayoritaria, pág. 510.

([54]) Son abundantes los ejemplos de casos en que hemos devuelto el expediente al foro primario para que se pueda presentar prueba y resolver según lo dispuesto en este Tribunal. De hecho, así lo hicimos en *Consejo Titulares v. Williams Hospitality*, supra, en el que decidimos que la Ley de Condominios de 2003 aplicaría retroactivamente en toda situación en la que no se afectara un derecho adquirido de los titulares de apartamentos, y devolvimos el caso al foro de instancia para que evaluara la prueba de acuerdo con lo resuelto.

([55]) Véase *Crespo Quiñones v. Santiago Velázquez*, supra, págs. 412–413 y 418–419.

V

El disfrute del apartamento por su propietario y la institución del Consejo de Titulares como órgano de control último en la administración del condominio son características fundamentales del Régimen de Propiedad Horizontal en Puerto Rico, y sus principios rectores son la prohibición del abuso del derecho y la buena fe.[56] La decisión mayoritaria es contraria a estas políticas ya que impide al dueño de un apartamento impugnar los actos sospechosos del presidente de la Junta de Directores de su condominio y la desidia de los administradores del inmueble, para su beneficio y el de los demás residentes. No puedo avalar que se utilice una disposición cuyo fin es penalizar la inercia para hacer todo lo contrario, penalizar la diligencia y persistencia del recurrido. Por todo ello, disiento.

---

[56] Exposición de Motivos y Art. 1A de la Ley de Condominios de 2003, Ley Núm. 103-2003 (2003 Leyes de Puerto Rico 355, 359–360).