ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL IV

| LUIS S. ROJAS RAMOS CHRISTIAN ROJAS RIVERAS<br><br>Parte Recurrida<br><br>v.<br><br>AUTO LARES CORP. UNIVERSAL INSURANCE CORP.<br><br>Parte Recurrente | KLRA202200542 | *REVISIÓN Administrativa* procedente del Departamento de Asuntos del Consumidor (~~DACO~~ DACo)<br><br>Querella núm.: ARE-2019-0001914<br><br>Sobre: Ley 5 de abril de 1973; Compra Venta de Vehículo de Motor |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Juez Barresi Ramos y la Jueza Rivera Pérez.

Rivera Pérez, Jueza Ponente

## S E N T E N C I A

En San Juan, Puerto Rico hoy, 28 de abril de 2023.

Comparece Auto Lares Corp. (en adelante, Auto Lares o recurrente) mediante *Recurso de Revisión* en el cual nos solicita que revoquemos la *Resolución* dictada el 31 de agosto de 2022, notificada el 1ro de septiembre de 2022, por el Departamento de Asuntos del Consumidor (en adelante, DACo).[1] Mediante dicho dictamen, ~~DACO~~ DACo declaró Con Lugar la querella presentada por el Sr. Luis S. Rojas Ramos y el Sr. Christian Rojas Riveras (en adelante, los recurridos); se ordenó el pago de ocho mil cuatrocientos dólares ($8,400.00) por concepto de la cancelación del contrato de compraventa dentro del término de veinte (20) días desde el archivo en autos de la *Resolución*; ordenó a Auto Lares a recoger el vehículo en la residencia de los recurridos a su propio costo y a que se realizara el traspaso del vehículo.

---

[1] Véase, Exhibit I, *Recurso de Revisión,* págs. 13-19.

Número Identificador

SEN2023_____

Por los fundamentos que expondremos a continuación, se confirma la *Resolución* recurrida.

**-I-**

El 29 de marzo de 2019, el Sr. Christian Rojas Riveras y su padre, el Sr. Luis S. Rojas Ramos, adquirieron un vehículo (marca GMC Modelo P.K. 2010, número de serie 1GTESCDE7A8140640) del concesionario Auto Lares Corp., el recurrente. Ese día, el vendedor le expresó que la unidad estaba en buenas condiciones y que todo estaba bien con la carrocería.[2]

El millaje del vehículo al momento de la compraventa era de ciento noventa y siete mil setecientos cincuenta y ocho (197,758) millas.[3] Por lo tanto, según la cantidad del millaje, el *Reglamento de Garantías de Vehículos de Motor* (Reglamento Núm. 7159), Reglamento Núm. 7159 de 6 de junio de 2006[4], del Departamento de Asuntos del Consumidor, dispone que no le aplica la garantía en piezas y mano de obra, pues pasa de las cien mil millas (100,000). A estos efectos, el Sr. Rojas Riveras y Auto Lares firmaron el acuerdo de compraventa en donde se pactó el precio de ocho mil cuatrocientos dólares ($8,400.00).

El Sr. Rojas Riveras probó el vehículo, lo verificó y estuvo de acuerdo con la compra del mismo sin garantía.[5] Al próximo día, el 30 de marzo de 2019, recogieron el vehículo en Auto Lares y se lo llevaron.

El mismo día (30 de marzo de 2019), el Sr. Rojas Riveras acudió a Arecibo Quick Lube para que le realizaran al vehículo un cambio de aceite y filtro, en donde se percata, por medio del mecánico que atendió el vehículo, que tiene un "liqueo" de aceite.[6]

---

[2] Véase, *Transcripción de la Vista Administrativa*, pág. 121 líneas 7-12.
[3] Véase, Exhibit III, *Recurso de Revisión,* pág. 20.
[4] Artículo 26.2, Reglamento de Garantías de Vehículos de Motor, Reglamento 7159.
[5] Véase, Exhibit III, *Recurso de Revisión,* pág. 20.
[6] Véase, TPO del 30 de agosto de 2022, pág. 73, líneas 14-25; pág. 92 líneas 10-12-25; pág. 93 líneas 1-11; pág. 100 líneas 5-25; pág. 101 líneas 8-25.

Acude entonces a Auto Lares para informar sobre el "liqueo" de aceite del vehículo al gerente del "dealer". En el lugar, un empleado le indicó que el gerente no se encontraba disponible.[7]

El 9 de abril de 2019, al no obtener respuesta de Auto Lares sobre el defecto, el Sr. Rojas Riveras acude a Garaje Junito para solucionar el problema del "liqueo" que el vehículo sufría.[8] Allí el Sr. Ignacio Cosme Avilés (en adelante, el Sr. Cosme Avilés), le notifica que el vehículo, al acelerarlo, tiene un ruido el cual le preocupaba. Procedió a reponer la junta de cover de válvula, la junta del "crank", el retenedor de atrás del motor y cambio de aceite y filtro.[9] Los arreglos del vehículo tuvieron un costo final de $600.00.[10] A su vez, le indicó que el vehículo hacia un ruido fuerte al acelerarlo.[11] El Sr. Rojas Riveras procede a llevarse el vehículo para la casa de su padre, el Sr. Rojas Ramos. Desde ese momento hasta el 2 de mayo de 2019 el Sr. Rojas Ramos continuó utilizando el vehículo para sus gestiones diarias.

Posteriormente, el 2 de mayo de 2019 el Sr. Rojas Riveras acudió nuevamente a Garaje Junito en busca de una cotización del arreglo del vehículo por el sonido que hacía cuando lo verificaron la primera vez.[12] En ese momento el Sr. Cosme Avilés le notificó al Sr. Rojas Riveras que, para poderle ofrecer un costo específico del arreglo del vehículo, tenía que desmontar primero el motor en su totalidad y luego verificarlo para poder reparar el daño que pudiese tener.[13] El Sr. Rojas Riveras decidió no reparar el vehículo. Ese mismo día, los recurridos presentaron una querella en DACo. En síntesis, solicitaron la recisión del contrato por defectos de fábrica y

---

[7] Véase, TPO del 30 de agosto de 2022, pág. 74, líneas 17-25.
[8] Véase, TPO del 30 de agosto de 2022, pág. 83 líneas 11-18; pág. 84 líneas 7-14.
[9] Véase, TPO del 30 de agosto de 2022, pág. 40, líneas 16-20; pág. 44 líneas 8-23.
[10] Véase, *Copia del Expediente Certificado por el Departamento de Asuntos del Consumidor.* Además, véase, TPO del 30 de agosto de 2022, pág. 46, líneas 17-21; pág. 47 líneas 7-11; pág. 52 líneas 4-17.
[11] Véase, TPO del 30 de agosto de 2022, pág. 110, líneas 9-13; pág. 111 líneas 18-22.
[12] Véase, TPO del 30 de agosto de 2022, pág. 85, líneas 23-25; pág. 86 líneas 1-3.
[13] Véase, TPO del 30 de agosto de 2022, pág. 60, líneas 7-15.

alegaron saneamiento por vicios ocultos e incumplimiento de contrato.

Como parte del proceso administrativo, el 18 de julio de 2019, el DACo realizó la inspección de la unidad. El informe de inspección, notificado el 16 de agosto de 2019, reflejó que la unidad estaba desvielada y que tenía un sonido fuerte al prenderla y al calentar.[14] Además, arrojó que el motor del vehículo había que cambiarlo completamente por el siguiente costo estimado:

> **Motor Usado: $1,500.00 Labor: $700.00 Total: $2,200.00**
> **Reparación de Motor: $1,000.00 Machine Shop: $1,400.00 Accesorios: $500.00 Total: $2,900.00.**[15]

Tras varios incidentes procesales, la parte recurrida solicitó el 20 de febrero de 2020 enmienda a la querella a los efectos de incluir como parte indispensable a la fiadora, Universal Insurance Company (en adelante, Universal). Además, solicitaron el pago de los gastos incurridos en mecánicos tratando de arreglar el vehículo desvielado.

El 15 de octubre de 2020, los recurridos solicitaron al DACo se le anotara la rebeldía a Auto Lares y a Universal por no haber contestado la querella enmendada y que se dictara resolución concediendo el remedio solicitado.

Luego de varias extensiones de los términos, el 24 de agosto de 2021, Auto Lares y Universal presentaron cada uno su *Contestación a Querella.* Ese mismo día, Universal presentó su *Objeción a Informe de Inspección* que se había realizado por el inspector del DACo.

Posteriormente, el 23 de septiembre de 2021, las partes presentaron el *Informe Conjunto de Conferencia Preliminar de Abogados/as.* Luego de varios trámites procesales, el 30 de agosto

---

[14] Véase, Exhibit IV, *Recurso de Revisión,* pág. 21-24.
[15] *Íd.*

de 2022 se celebró la *Vista Administrativa*. En la vista en su fondo presentaron sus testimonios el Inspector Edgar Cotto González (Investigador de Querellas de Automóviles de DACo), el Sr. Ignacio Cosme Avilés (Mecánico que revisó el automóvil), el Sr. Christian Rojas Riveras (Recurrido) y el Sr. Waldemar Díaz Lamur (Gerente de Auto Lares). El 31 de agosto de 2022, notificada el 1ro de septiembre de 2022, el DACo emitió la *Resolución* recurrida. Mediante dicho dictamen, emitió las siguientes determinaciones de hechos:

1) Las partes querellantes se identifican en la presente querella como Luis S. Rojas Ramos y Christian Rojas Rivera, residentes de Arecibo, P.R. y con dirección postal, según surge del expediente administrativo, en PO BOX 903, Garróchales, P.R. 00652.

2) La parte querellada se identifica en la presente querella como Auto Lares, Corp., un concesionario registrado y activo ante el Registro de Corporaciones y Entidades del Departamento de Estado del Gobierno de Puerto Rico desde el día 3 de junio de 1994 con número de registro 86988 y agente residente Baltazar Rodríguez Cruz.

3) La parte coquerellada se identifica en la presente querella como Universal Insurance Company, una aseguradora registrada y activa ante el Registro de Corporaciones y Entidades del Departamento de Estado del Gobierno de Puerto Rico desde el día 15 de mayo de 1970 con número 49 y sin agente residente visible en dicho registro.

4) El día 29 de marzo de 2019, las partes suscribieron un contrato de compraventa por un vehículo de motor marca GMC, modelo P.K. del año 2010, color azul con número de tablilla 1006708, número de serie 1GTESCDE7A8140640 y 197,758 millas recorridas por la cantidad de ocho mil cuatrocientos dólares ($8,400.00) sin garantías.

5) Según el testimonio de las partes, la unidad fue inspeccionada previo a la compraventa encontrándola en condiciones y sin defectos; esto sin la pericia de un mecánico que lo certificara.

6) Según el testimonio del Querellante, tras la compra de la unidad, advino en conocimiento que la misma tenía un liqueo de aceite suficiente como para entender que debía ser examinado por un mecánico, por lo cual reclamó al concesionario los defectos encontrados en la unidad, resultando su gestión en

una infructuosa, por lo que llevó la unidad al Garaje Junito en Arecibo.

7) Según el testimonio de las partes y la evidencia presentada, el día 9 de abril de 2019, el Sr. Ignacio Cosme Avilés número de licencia 0004392 intervino en la unidad encontrando que la misma tenía un liqueo de aceite de motor por el cran y otras áreas del motor, cambiando la junta de cover de válvulas, junta del cran, retenedor de atrás del motor y aceite y filtro por la cantidad de seiscientos $600.00 dólares.

8) Según el testimonio del Querellante, la unidad continuó confrontando dificultades mecánicas y sosteniendo un sonido irregular al acelerarse por lo cual regresó al mecánico del Garaje Junito para una nueva evaluación.

9) Según el testimonio de las partes y la evidencia presentada, el día 2 de mayo de 2019, el Sr. Ignacio Cosme Avilés número de licencia 0004392 intervino en la unidad encontrando que la misma podría tener problemas en los bearings del cigüeñal, pero que no podía dar precio de reparación hasta no abrir el motor, cosa a la cual se opuso el Querellante, radicando su querella ante el Departamento el mismo día.

10) El Querellante solicita como remedio la recisión del contrato y la devolución de las contraprestaciones.

A su vez, el DACo declaró Con Lugar la querella concediendo la resolución del contrato de compraventa convenido entre las partes el 29 de marzo de 2019; ordenó a Auto Lares y a Universal a hacerle entrega al Sr. Rojas Ramos la cantidad de $8,400.00 por concepto de cancelación del contrato de compraventa y ordenó el recogido del vehículo.

Inconforme, el 3 de octubre de 2022, Auto Lares acudió ante nos mediante *Recurso de Revisión,* en el cual señala el siguiente error:

> Erró el Departamento de Asuntos del Consumidor, por medio del Honorable Juez, al resolver el presente caso utilizando la doctrina de saneamiento por vicios ocultos, cuando lo cierto es que el presente caso se trata de un vehículo sobre 100,000 millas, el cual no tenía garantía.

El 20 de diciembre de 2022, concedimos a la parte recurrida hasta en o antes del 20 de diciembre de 2022 para presentar su escrito en oposición ello en conformidad con dictamen decretado el 30 de noviembre de 2022. El 27 de diciembre de 2022, el Sr. Rojas Ramos y el Sr. Rojas Riveras presentaron el *Escrito de Oposición a Recurso de Revisión de Resolución Administrativa del Departamento de Asuntos del Consumidor (DACO)*.

Contando con el beneficio de la comparecencia de las partes, procedemos a resolver.

**-II-**

### A. *Revisión judicial de determinaciones administrativas*

La revisión judicial de las decisiones administrativas tiene como fin delimitar la discreción de los organismos administrativos, para asegurar que ejerzan sus funciones conforme la ley y de forma razonable. *Unlimited v. Mun. de Guaynabo*, 183 DPR 947, 965 (2011); *Empresas Ferrer v. A.R.Pe.*, 172 DPR 254, 264 (2007). A esos efectos, la revisión judicial comprende tres aspectos: la concesión del remedio apropiado, la revisión de las determinaciones de hecho conforme al criterio de evidencia sustancial, y la revisión completa de las conclusiones de derecho. *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 217 (2012), citando a *Asoc. Fcias v. Caribe Specialty et al. II*, 179 DPR 923, 940 (2010) y *Mun. de San Juan v. J.C.A.*, 149 DPR 263, 279-280 (1999).

Nuestro Tribunal Supremo ha establecido que las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal si se basan en evidencia sustancial que surja del expediente administrativo considerado en su totalidad. *Batista, Nobbe v. Jta. Directores, supra*, pág. 216, citando a *Pereira Suárez v. Jta. Dir. Cond.*, 182 DPR 485, 511-512 (2011); *Domínguez v. Caguas Expressway Motors*, 148 DPR 387, 397-398 (1999). La evidencia sustancial es "aquella evidencia relevante que una mente

razonable podría aceptar como adecuada para sostener una conclusión". *Íd.*, citando a *Pereira Suárez v. Jta. Dir. Cond., supra; Otero v. Toyota*, 163 DPR 716, 728 (2005). Dicho análisis requiere que la evidencia sea considerada en su totalidad, esto es, tanto la que sostenga la decisión administrativa, como la que menoscabe el peso que la agencia le haya conferido. *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.*, 144 DPR 425, 437 (1997). Por lo tanto, el tribunal podrá sustituir el criterio de la agencia por el propio sólo cuando no pueda hallar una base racional para explicar la decisión administrativa. *Otero v. Toyota, supra*, pág. 729.

Debido a la presunción de regularidad y corrección de los procedimientos y las decisiones de las agencias administrativas, quien alegue ausencia de evidencia sustancial tendrá que presentar prueba suficiente para derrotar esta presunción, no pudiendo descansar en meras alegaciones. *Pacheco v. Estancias*, 160 DPR 409, 431 (2003). Para ello, deberá demostrar que existe otra prueba en el expediente, que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración. *Gutiérrez Vázquez v. Hernández y otros*, 172 DPR 232, 245 (2007).

Si la parte afectada no demuestra la existencia de otra prueba que sostenga que la actuación de la agencia no está basada en evidencia sustancial o que reduzca o menoscabe el valor de la evidencia impugnada, el tribunal respetará las determinaciones de hecho y no sustituirá el criterio de la agencia por el suyo. *Otero v. Toyota, supra*, pág. 728. En cambio, las conclusiones de derecho son revisables en todos sus aspectos. *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 894 (2008). De esta manera, los tribunales, al realizar su función revisora, están compelidos a considerar la especialización y la experiencia de la agencia con respecto a las leyes

y reglamentos que administra. *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, 150 DPR 70, 75-76 (2000). Así pues, si el punto de derecho no conlleva interpretación dentro del marco de la especialidad de la agencia, entonces el mismo es revisable sin limitación. *Rivera v. A & C Development Corp.*, 144 DPR 450, 461 (1997).

Sin embargo, aun cuando el tribunal tiene facultad para revisar en todos sus aspectos las conclusiones de derecho de una agencia, se ha establecido que ello no implica que los tribunales revisores tienen la libertad absoluta para descartarlas libremente. *López Borges v. Adm. Corrección*, 185 DPR 603, 626 (2012); *Federation des Ind. v. Ebel*, 172 DPR 615, 648 (2007).

**B. Ley Orgánica del Departamento de Asuntos del Consumidor y el Reglamento 7159**

La Ley Núm. 5 del 23 de abril de 1973, según enmendada, conocida como *Ley Orgánica del Departamento de Asuntos del Consumidor*, 3 LPRA sec. 341, *et seq.*, delegó en el DACo la responsabilidad de vindicar e implementar los derechos del consumidor. Para ello, "se estableció en la agencia una estructura de adjudicación administrativa 'con plenos poderes para adjudicar las querellas que se traigan ante su consideración y conceder los remedios pertinentes conforme a derecho'". *Ortiz Rolón v. Soler Auto Sales, Inc., et al.,* 202 DPR 689, 696 (2019); 3 LPRA sec. 341e(d). (Énfasis nuestro).

A su vez, la Ley Núm. 7 del 24 de septiembre de 1979, según enmendada, *Ley de Garantías de Vehículos de Motor* (Ley de Garantías de Vehículos de Motor), 10 LPRA sec. 2051, *et seq.*, fue promulgada con el fin de "garantizar la seguridad, salud y bienestar de la comunidad evitando que vehículos de motor defectuosos, de gran potencialidad de daño al conductor, ocupantes y otros, transiten por las vías públicas". *Exposición de Motivos* de la Ley de Garantías de Vehículos de Motor.

Asimismo, para proteger a los consumidores de vehículos de motor e imponerles a los fabricantes o manufactureros, y a los distribuidores y vendedores, como eslabones en la cadena de distribución, la responsabilidad y obligación de brindarle a los consumidores el servicio de garantía de fábrica, independientemente del lugar donde el consumidor haya adquirido dicho vehículo. *Íd.*

En virtud de ello, el Secretario del DACo promulgó el *Reglamento de Garantías de Vehículos de Motor*, Reglamento Núm. 7159 de 6 de julio de 2006 (Reglamento Núm. 7159)[16]. El propósito de este Reglamento es proteger a los consumidores que invierten en la adquisición de vehículos de motor, y procurar que estos sirvan para los propósitos para los cuales fueron adquiridos, y que tengan las condiciones mínimas necesarias para garantizar la protección de la vida y propiedad[17].

En lo pertinente, la Regla 26.1 y 26.2 del Reglamento Núm. 7159, disponen lo siguiente:

> **Regla 26.1:** Se prohíbe vender un vehículo de motor usado sin garantía.
>
> **Regla 26.2:** Todo vendedor de vehículos de motor usados, concederá garantía, en piezas y mano de obra. Esta garantía será a base del millaje recorrido y según la siguiente escala:
> > a) Hasta 36,000 millas – cuatro (4) meses o cuatro mil (4,000) millas, lo que ocurra primero.
> > b) Más de 36,000 millas y hasta 50,000 millas – tres (3) meses o tres mil (3,000) millas, lo que ocurra primero.
> > c) **Más de 50,000 millas y hasta 100,000 millas – dos (2) meses o dos mil (2,000) millas, lo que ocurra primero.**
>
> (Énfasis nuestro)

Además, la Regla 37 del referido reglamento establece que nada de lo dispuesto en él limita el derecho del consumidor a ejercer

---

[16] Cabe señalar que algunas reglas del Reglamento Núm. 7159 fueron enmendadas por el Reglamento Núm. 7920 de 3 de septiembre de 2010, por lo cual de aplicar alguna regla enmendada por dicho reglamento así lo haremos constar.
[17] Regla 2 del Reglamento Núm. 7159.

cualquier acción que le reconozcan las leyes del Estado Libre Asociado de Puerto Rico, así como las acciones de saneamiento por evicción o vicios ocultos, y la acción redhibitoria que reconoce el Código Civil para los contratos de compraventa. *Polanco v. Cacique Motors*, 165 DPR 156, 165 (2005).

En lo pertinente, el Artículo 1350 del Código Civil, 31 LPRA sec. 3801, dispone que, en el contrato de compraventa, el vendedor está obligado a la entrega y al saneamiento de la cosa vendida.[18] Por su lado, el Artículo 1363 del Código Civil, 31 LPRA sec. 3831, dispone que, en virtud de la obligación de saneamiento, el vendedor responderá al comprador: (1) de la posesión legal y pacífica de la cosa vendida, y (2) de los vicios o defectos ocultos que tuviere esta.

Para que proceda una acción de saneamiento por vicios ocultos, se tienen que cumplir los siguientes requisitos: (1) que la cosa adolezca de un vicio oculto, que no sea conocido por el adquirente al momento de la compraventa; (2) que el vicio sea de tal gravedad que haga la cosa impropia para el uso al que se destina o disminuya notablemente su valor de manera que el comprador no habría adquirido la cosa de haberlo conocido; (3) el defecto debe ser preexistente a la venta; y, (4) la acción debe ejercitarse dentro del plazo legal de seis meses contados desde la entrega de la cosa vendida. *Polanco v. Cacique Motors, supra.*

Además, en estos casos el Código Civil dispone que el comprador puede optar entre: (1) la acción redhibitoria, que coloca a las partes en la condición que se encontraban antes de la compraventa, mediante la restitución de las prestaciones, o (2) la reducción del precio en una cantidad proporcional, a juicio de peritos. *Polanco v. Cacique Motors, supra*; 31 LPRA sec. 3843.

---

[18] Aludimos a las disposiciones del ya derogado Código Civil de 1930, a la luz de que este estaba aún vigente al momento de los hechos que generaron esta controversia. Ello, pues la Ley Núm. 55-2020 o Código Civil de Puerto Rico, entró en vigor el 28 de noviembre de 2020.

Ahora bien, para que proceda una acción redhibitoria, los vicios tienen que ser de tal naturaleza que la imperfección o defecto haga imposible el uso del objeto, o que el uso se vea disminuido al extremo de mermar considerablemente la utilidad o el valor de la cosa para el propósito para el cual fue adquirida. *Domínguez v. Caguas Expressway Motors, supra,* pág. 397.

Asimismo, en cuanto al peso de la prueba sobre la existencia de vicios ocultos, el Tribunal Supremo de Puerto Rico ha opinado que "el comprador de un vehículo de motor –sea éste nuevo o usado– al reclamar por vicios ocultos, sólo estará obligado a demostrar que el automóvil funcionaba normalmente al momento de la compra y que el vendedor no quiso o no pudo corregir el defecto, a pesar de haber tenido la oportunidad de hacerlo". *Polanco v. Cacique Motors, supra.*

**-III-**

En el presente recurso, nos corresponde determinar si el DACo incidió al decretar la recisión del contrato y la devolución del dinero y concluir que se configuró la figura de vicios ocultos en el vehículo objeto del caso. Analizados los hechos particulares de la acción a la luz del derecho aplicable, concluimos que el DACo no erró en su determinación final.

En primer lugar, recalcamos que este Tribunal no puede sustituir el juicio o el criterio del DACo por el suyo, a menos que el ente administrativo haya actuado de manera **arbitraria, ilegal, irrazonable o fuera del marco de los poderes que se le delegaron**. Por tanto, procederemos a discutir el error señalado por Auto Lares.

En síntesis, Auto Lares aduce que el DACo erró al resolver el caso utilizando la doctrina de saneamiento por vicios ocultos cuando se trataba de un vehículo con más de 100,000 millas, el cual no tenía garantía. Por lo tanto, debemos determinar si Auto Lares vendió el vehículo con un desperfecto que causó se desvielara o si el

Sr. Rojas Riveras y el Sr. Rojas Ramos causaron que el vehículo sufriera los daños alegados. Veamos.

Según el derecho expuesto, un consumidor podrá instar una acción de saneamiento por vicios ocultos cuando, posterior a la entrega del vehículo, se evidencian **defectos de tal naturaleza que haga imposible el uso del objeto**, **o que el uso haya sido disminuido al extremo de mermar considerablemente la utilidad o el valor de la cosa en cuanto al propósito para el cual fue adquirida**. De ser así, el comprador puede optar entre una acción redhibitoria, en la que se restituyen las prestaciones, o la reducción del precio en una cantidad proporcional.

Según surge de la Transcripción de la Prueba Oral (en adelante, TPO), de la Vista Administrativa llevada a cabo el 30 de agosto de 2022, el 29 de marzo de 2019, el Sr. Rojas Riveras adquirió un vehículo de motor usado en el concesionario Auto Lares Corp.[19] Antes de llevarse el vehículo, tuvo la oportunidad de verificarlo y estuvo de acuerdo en que el vehículo se encontraba en buenas condiciones. Además, surge que el Sr. Rojas Riveras aceptó las condiciones de la compra, es decir, que el vehículo por el millaje que tenía no cualificaba para garantía.[20] Finalmente, el Sr. Rojas Riveras y su señor padre, se llevaron el vehículo del concesionario y el mismo día lo llevaron a Arecibo Quick Lube para realizarle cambio de aceite y filtro, pues acostumbraban a hacerlo luego de adquirir un vehículo usado.[21]

El Sr. Rojas Riveras, como parte de su testimonio, declaró que cuando llevó el vehículo a Arecibo Quick Lube, al levantar la guagua en un pino, se veía un "pequeño liqueo" y que ameritaba el arreglo del mismo.[22] Declaró también que el "liqueo" lo pudo ver cuando

---

[19] Véase, TPO del 30 de agosto de 2022, pág. 70, líneas 7-11.
[20] Véase, TPO del 30 de agosto de 2022, pág. 92, líneas 1-9.
[21] Véase, TPO del 30 de agosto de 2022, pág. 73, líneas 14-18; pág. 71 líneas 1-9; pág. 109 líneas 4-6.
[22] Véase, TPO del 30 de agosto de 2022, pág. 73, líneas 21-25.

estaba en el pino pues se encontraba posterior a la posición del vehículo, pero no pudo verlo desde abajo pues las reglas del lugar no se lo permitían.[23] Igualmente declaró que cuando le entregaron el vehículo, verificó la varilla del aceite y en efecto, había una merma de aceite por lo que tuvo que echarle aceite.[24] Además, aseguró que reclamó a Auto Lares el "liqueo" pero en ese momento lo atendió un empleado que le notificó que el vehículo no tenía garantía y que el "jefe" no se encontraba disponible.[25]

Más tarde, el Sr. Rojas Riveras declaró que ocho (8) o diez (10) días después de la compra del vehículo, acude a Garaje Junito para que evaluaran el vehículo.[26] El Sr. Cosme Avilés recibió el vehículo debido a que el Sr. Rojas Riveras le notificó que tenía un "liqueo" de aceite, por lo que procedió a verificarlo. Ahí, el Sr. Cosme Avilés le indicó que el vehículo tenía un ruido fuerte al encenderlo y acelerarlo.[27] En esa visita al garaje, el Sr. Cosme Avilés revisó e intervino con varias cosas del vehículo, entre ellas la transmisión, el cigüeñal, la junta de válvula y la junta del "crank".[28] La factura por los servicios realizados por el Sr. Cosme Avilés incluyeron la junta del bloque, la junta de tapa de válvulas, la junta del "crank" y tuvo un costo de $600.00.[29]

A preguntas de la representación legal de los recurridos, el Sr. Cosme Avilés declaró que los motores de los vehículos suenan cuando prenden, pero no "pistonear" como lo hacía el vehículo que el Sr. Rojas Riveras compró a Auto Lares. **Además, mencionó que no se podía concluir que el vehículo se dañó como resultado de**

---

[23] Véase, TPO del 30 de agosto de 2022, pág. 92, líneas 13-22.
[24] Véase, TPO del 30 de agosto de 2022, pág. 101, líneas 1-25; pág. 102 líneas 1-8.
[25] Véase, TPO del 30 de agosto de 2022, pág. 74, líneas 14-25; pág. 75 líneas 1-5.
[26] Véase, TPO del 30 de agosto de 2022, pág. 75, líneas 6-16.
[27] Véase, TPO del 30 de agosto de 2022, pág. 40, líneas 16-25; pág. 41 línea 1.
[28] Véase, TPO del 30 de agosto de 2022, pág. 44, líneas 16-25; pág. 41 línea 1.
[29] Véase, TPO del 30 de agosto de 2022, pág. 51, líneas 2-20, pág. 57 líneas 1-2.

**llevarse a su taller.**[30] Aseguró que de no arreglarse el carro en las condiciones en las que estaba, se podía desvielar.[31]

Por otro lado, el Sr. Cosme Avilés declaró que, al encender el vehículo, sonaba fuerte y que eso significaba que el "bearing" estaba "flojito", y así lo notificó al Sr. Rojas Riveras y a su señor padre.[32]

Luego, el Sr. Rojas Riveras procede a llevarse el vehículo del Garaje Junito. Posteriormente, el 2 de mayo el Sr. Rojas Riveras acude nuevamente a Garaje Junito donde el Sr. Cosme Avilés le notificó que había que abrir el motor completamente para poder verificarlo y cotizar el arreglo.[33] Como consecuencia de esto, el Sr. Rojas Riveras acude a DACo para presentar una querella en contra de Auto Lares.

A la luz de esto, el DACo ordenó la devolución de $8,400.00 por concepto de la cancelación del contrato y el recogido del vehículo. Sobre la alegación de los vicios ocultos, el DACo concluyó que se trataba de un caso de saneamiento por vicios ocultos, por ser una situación en donde después de verificada la entrega de la cosa, se observan los vicios ocultos que la hacen impropia para el uso destinado o disminuyen de tal modo su utilidad que, de haberlos conocido el comprador, no la hubiese adquirido o habría dado menos precio por ella.

Así pues, evaluado el expediente ante nos, concluimos, como lo hizo el foro recurrido, que se trata de un caso de saneamiento por vicios ocultos debido al desperfecto mecánico que tenía el vehículo. Ello, pues los vicios del vehículo hacen imposible su uso y disminuyen su valor de tal modo que, de haberlo conocido el comprador, no la hubiese adquirido. Por lo tanto, se cumplen los requisitos para poder levantar una causa de acción bajo la doctrina

---

[30] Véase, TPO del 30 de agosto de 2022, pág. 57, líneas 17-25, pág. 58 línea 1-3.
[31] Véase, TPO del 30 de agosto de 2022, pág. 58, líneas 4-20.
[32] Véase, TPO del 30 de agosto de 2022, pág. 66, líneas 2-14.
[33] Véase, TPO del 30 de agosto de 2022, pág. 60, líneas 10-21.

de saneamiento por vicios ocultos. Veamos los requisitos para que la referida acción prospere.

El **primer requisito** es que la cosa adolezca de un vicio oculto, que no sea conocido por el adquirente al momento de la compraventa. Podemos concluir que, en este caso, al momento de la compraventa, el vehículo que adquirió el Sr. Rojas Riveras adolecía de un vicio oculto, el cual no conocía y así surge de la transcripción de la prueba oral de la vista del 30 de agosto de 2022. El Sr. Rojas Riveras tuvo la oportunidad de examinar el vehículo, verlo por dentro, abrir el "cofre", e incluso lo prendió y lo movió. En ese momento, el vehículo se encontraba en condiciones para su entrega, sin embargo, el mismo día que lo compraron, lo llevaron a hacerle cambio de aceite y filtro, y se percataron de que el vehículo tenía un "liqueo" de aceite, esto antes de que alguien lo interviniera.

El **segundo requisito** es que el vicio sea de tal gravedad que haga la cosa impropia para el uso al que se destina o disminuya notablemente su valor de manera que el comprador no habría adquirido la cosa de haberlo conocido. En cuanto a este requisito el defecto del cual sufría el vehículo lo hacía impropio para el uso que se destina, pues el carro debido a dicho desperfecto, se desvieló, causando así que perdiera valor y no se pudiese utilizar para el uso al que se destinaba.

El **tercer requisito** es que el defecto debe ser preexistente a la venta. Según surge de los testimonios de la *Vista Administrativa* del 30 de agosto de 2022, se pudo determinar que dicho defecto, en efecto, lo tenía con anterioridad al día de la venta. Aunque el Inspector Cotto González testificó que no se podía precisar quién fue el causante del defecto que tenía el vehículo, el Sr. Rojas Riveras y el mecánico que verificó el vehículo, el Sr. Cosme Avilés, testificaron que el vehículo sí tenía el "liqueo" antes de intervenirlo y que eso

podía ser causa para que tuviese problemas posteriores al uso del mismo, como surgió en este caso.

Por último, el **cuarto requisito** es que la acción debe ejercitarse dentro del plazo legal de seis meses contados desde la entrega de la cosa vendida. En este caso, la reclamación se realizó dentro del término dispuesto.

Por lo tanto, al surgir prueba que demostró que el vehículo adquirido por el Sr. Rojas Riveras y el Sr. Rojas Ramos, sufría de un desperfecto mecánico con anterioridad a la compraventa del automóvil con Auto Lares, concluimos que el DACo no erró en su apreciación de la prueba, por lo que procede se confirme la *Resolución* recurrida. Dicha determinación está fundamentada en la prueba sustancial que forma parte del expediente administrativo. Por otro lado, la parte recurrente no probó que el DACo actuara de manera arbitraria, ilegal, irrazonable o fuera del marco de los poderes que se le delegaron. Así las cosas, no se cometió el error señalado.

**-IV-**

Por los fundamentos anteriormente expuestos, se confirma la *Resolución* recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones